**SIERRA CLUB, et al., Plaintiffs,**

v.

**John BLOCK, et al., Defendants.**

**Civ. A. No. 85–2226.**

United States District Court,
District of Columbia.

July 31, 1985.

Douglas L. Honnold, Denver, Colo., Eric P. Jorgensen, Washington, D.C., for plaintiffs.

Rebecca Donnellan, Dept. of Justice, Washington, D.C., for defendants.

## MEMORANDUM

GESELL, District Judge.

This case challenges the propriety of a government program that involves extensive cutting of trees in four southern wilderness areas. It is presently before the Court on the plaintiff's motion for a preliminary injunction based on alleged violations of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332, and the Endangered Species Act, 16 U.S.C. §§ 1531–1543. After reviewing extensive affidavits and briefs submitted by the parties and hearing oral argument, the Court finds as follows.

### Background

This case places the Court in the middle of an environmental dilemma. The Southern Pine Beetle is killing thousands of acres of pine trees in the southeastern United States. Beetle infestations start with a "spot" (approximately 50 trees or more) of yellowing, dying pine trees that rapidly grows as the beetles reproduce and attack more trees. In order to control the spots the government is cutting the infested trees and creating "buffer" areas by cutting uninfested pine trees around the spots. Thousands of acres of pine trees have already been cut in an effort to control the beetles' progress and some of the buffer zones extend for miles. The cut trees are sometimes removed or treated with chemicals, but they are often left in the forest untreated. The cutting program is currently being used in the national forests and the national wilderness areas and similar control methods are being followed on private timberlands, at the urging of state and federal authorities. The government maintains that without this cutting program, the southern pine beetle infestations may destroy commercial and environmental value of the pine forests.

The plaintiffs complain that the cutting is destroying national wilderness areas. The government's control efforts bring in motorized equipment and leave behind fallen timber, stumps and large areas of cleared woodlands, destroying the pristine environment of wilderness forests that have been set aside to be protected from gross human intrusion as a matter of national policy. *See* Wilderness Act, 16 U.S.C. § 1131(c). Moreover, they argue, there is no scientific proof that the cutting is effective in stopping the beetle. Plaintiffs maintain that it is better to risk loosing the trees to a natural pest like the beetle than to have planned destruction of wilderness areas proceed without full appraisal of its environmental consequences.[1]

In the middle of this controversy is the red-cockaded woodpecker, an endangered species. The woodpecker lives in living pine trees and depends on the pine forests for its habitat. The government maintains that the cutting program is necessary, in part, because it protects the red-cockaded woodpecker from the direct threat posed by beetles killing the pine trees housing woodpecker colonies and from the indirect threat posed by the potential long-range loss of the pine forests. Thus, the government's program has two principle objectives: to prevent spreading beetle infestations from destroying the commercial value of pine forests adjacent to the wilderness areas and, where red-cockaded woodpecker colonies are known to exist, save the colonies and their habitat. The plaintiffs argue that the government's cutting of pine trees around woodpecker colonies harms their habitat and has not been shown to have any beneficial effect on the colonies.

Plaintiffs seek to preliminarily enjoin the cutting program in four wilderness areas: Black Creek and Leaf Wilderness area in DeSoto National Forest, Mississippi; Caney Creek Wilderness area in Ouchita National Forest, Arkansas; and Kisatchie Hills Wilderness area in Kistchie Hills National Forest, Louisiana. In initiating these cutting programs, the government has made some effort to comply with NEPA and the Endangered Species Act. Since 1982, three environmental assessment statements (EAS) have been issued, each covering the

---

1. Plaintiffs also maintain that the cutting program violates the Wilderness Act, but this claim is not before the Court in this motion for a preliminary injunction.

control program in one of the three national national forests, including the wilderness areas within those forests. All three assessments concluded that the southern pine beetle control program will not result in any significant impact on the environment so no environmental impact statement (EIS) was required in order to comply with NEPA. Prior to these assessments, a programatic EIS on the southern pine beetle control program was completed in 1974. A new programatic EIS is now in progress and is scheduled to appear in draft form in October, 1985. In addition, the Forest Service has engaged in consultations with the Fish and Wildlife Service, pursuant to its obligations under the Endangered Species Act. *See* 50 C.F.R. § 402.04. These consultations have resulted in special guidelines for conducting the cutting in the vicinity of red-cockaded woodpecker colonies. If these guidelines are followed, the Fish and Wildlife Service believes that the cutting program is "not likely to jeopardize the continued existence of the red-cockaded woodpecker."

### Discussion

*1. The National Environmental Policy Act.*

■ In determining whether the Forest Service's decision not to prepare an EIS is likely to be upheld, the Court is guided by the Council on Environmental Quality's (CEQ) guidelines on NEPA compliance, 40 C.F.R. §§ 1501-08, and an inquiry into (1) whether the agency took a "hard look" at the environmental problems; (2) whether the agency identified the relevant areas of environmental concern; (3) whether the agency has made a convincing case that the problems it has identified pose an insignificant impact; and (4) whether the agency has convincingly established that changes in the project reduced any significant impact to a minimum. *Sierra Club v. United States Department of Transportation,* 753 F.2d 120, 127 (D.C.Cir.1985); *Cabinet Mountains Wilderness v. Peterson,* 685 F.2d 678, 682 (D.C.Cir.1982); *Maryland National Capital Park & Planning Commission v. U.S. Postal Service,* 487 F.2d

1029, 1040 (D.C.Cir.1973). In short, the Court must determine whether "the agency has supplied convincing reasons why potential impacts are truly insignificant." 487 F.2d at 1040.

The environmental assessments on the southern pine beetle control program do not appear to meet this standard. None of the environmental statements adequately address the impact of cutting wilderness areas. The 1974 EIS is addressed to cutting programs in forests that are to be harvested for commercial use and does not even attempt to address wilderness values. The more recent EASs only contain a cursory and prefunctory discussion of the wilderness problem. Moreover, under CEQ's definitions, any action "with effects that may be major" in light of its context and intensity requires a EIS. 40 C.F.R. §§ 1508.18, 1508.25. One could not rationally conclude that cutting thousands of acres of pine trees in a wilderness forest will not have any effects that may be major. *See Wyoming Outdoor Coordinating Council v. Butz,* 484 F.2d 1244, 1249–50 (10th Cir.1973).

Indeed, the government does not even defend the finding of "no significant impact" in this litigation. Instead the government argues that the assessment statements indicate the 1974 EIS need not be supplemented and that there is an emergency situation which justifies going forward without awaiting the completion of a complete EIS. However, these arguments appear to be post hoc rationalizations since the EASs do not offer any of these reasons as a basis for the conclusion that no EIS was necessary. Moreover, it appears that a new EIS is necessary to supplement the previous statement. The 1974 EIS evaluated a different set of control programs under significantly different circumstances. *See* 40 C.F.R. § 1502.9(c)(1)(ii). The first of these EASs was issued in 1982 and no emergency has prevented the government from preparing an EIS for three years.

The EASs also appear to have other significant defects. None of them discuss the efficacy of the cutting program, which is

**492**

particularly important consideration in evaluating the extensive cutting in wilderness areas. If the cutting has a limited or no effect on the number of pine trees lost to beetle infestations, wilderness area policy might be better served by no control. Obvious alternatives to spot cutting suggested in the plaintiffs' submissions, such as cutting buffers between the wilderness areas and other forests to save commercial timber, have not been examined. Consequently, the Court concludes that the plaintiffs have shown a likelihood of prevailing on the merits of this claim.

### 2. The Endangered Species Act

■ The government argues that the court lacks jurisdiction over the plaintiffs' endangered species act claim relating to the effects of the cutting program on the red-cockaded woodpecker because they have failed to comply with the 60-day notice period provided in the statute. 16 U.S.C. § 1540(g)(2)(A). The Sierra Club sent notice of its objections on June 7, 1985. On July 2 the Fish and Wildlife Service replied, indicating its firm belief that the program was in full compliance with the Endangered Species Act and on July 5 the Forest Service sent a reply to the same effect. Plaintiffs filed this suit on July 12. The agencies involved are not reconsidering their position and the government has not alleged or shown any prejudice due to the timing of the notice. Under these circumstances the Court finds that the plaintiffs are in substantial compliance with the notice requirement and justice would not be served by declining jurisdiction to allow the few remaining days to run. Cf. Sierra Club v. Froehlke, 534 F.2d 1289, 1303 (8th Cir.1976).

On the merits, the Court finds that the plaintiff has failed to show a likelihood of proving a "take" of an endangered species to justify preliminary relief under the Act.. 16 U.S.C. § 1532(19). The information presented to the Court indicates that any threat to the red-cockaded woodpecker's habitat from the cutting occurs primarily, if not exclusively in the breeding season which ended in mid-July. The plaintiffs were only able to offer one siting of an abandoned colony and there is no indication that the government's cutting program was responsible for the woodpeckers abandoning this colony. The Forest Service's consultations with the Fish and Wildlife Service reflect careful consideration of the effect on the woodpeckers and devote special attention to avoiding interference with the woodpeckers' breeding and foraging. Plaintiffs have been unable to show that the Fish and Wildlife Service's limitations on cutting near colony sites are inadequate to protect the woodpecker colonies from injury or death. See 50 C.F.R. § 17.3 (defining "harass" and "harm" in the definition of "take").

### 3. The Availability of Equitable Relief

■ Having determined that plaintiffs have shown a likelihood of prevailing on their NEPA claim and have failed to show a likelihood of success on the Endangered Species Act claim, the Court must weigh three additional factors to determine whether a preliminary injunction is available. The Court must examine whether plaintiffs have shown that an injunction is necessary to prevent irreparable injury, whether an injunction will substantially harm other interested parties and whether an injunction is in the public interest. National Association of Farmworkers v. Marshall, 628 F.2d 604, 613 (D.C.Cir.1980); Virginia Petroleum Jobbers Association v. FPC, 259 F.2d 921, 925 (D.C.Cir.1958).[2]

2. The government argues that laches precludes equitable relief for the plaintiffs because they were aware of the government's plans during the spring and have prejudiced the government by waiting until the "prime" cutting season to bring suit. This argument is without merit. The government admits that no cutting is currently being conducted and only one of the four wilderness areas anticipates renewed cutting in the foreseeable future. Moreover, the government cannot claim any surprise from this suit since Sierra Club filed a similar suit challenging the southern beetle control program in wilderness areas in Texas. Sierra Club v. Block, 614 F.Supp. 134 (E.D.Tx.1985).

With respect to those areas where the government plans to cut in wilderness areas in order to protect private or public forests, the Court finds that enjoining the cutting program until the government demonstrates that it has complied with NEPA will prevent irreparable harm, will not impose substantial harm on others, and will be in the public interest. The cutting imposes a scar on the wilderness areas that may take 70 years or more to heal. A full consideration of the environmental impacts of this cutting is precisely what NEPA mandates, in the belief that a federal program should not go forward until full consideration is given to these impacts. The government has failed to show that a substantial harm will result if the cutting is enjoined, particularly in light of the fact that no cutting is anticipated in three of the four wilderness areas and preparation of a new EIS is already underway.

Where the government plans to cut solely to protect red-cockaded woodpecker colonies, it is more difficult to determine where the public interest lies. This case poses an environmental Catch 22: concern for preservation of pristine wilderness conflicts with concern for the red-cockaded woodpecker whose habitat may be threatened unless the government cuts down infested wilderness trees. The woodpecker lives in large colonies established only in live pine trees. Thus heavy infestations of the beetle around colony trees may endanger it by destroying its home. At least one colony has reportedly been destroyed by southern pine beetles. Costa Affd. ¶ 4. Two colonies appear to have been saved by the control program. *Id.* ¶ 7. However, cutting is most effective against the beetle in the hot summer months when it may be most harmful to the woodpecker because this is the woodpecker's breeding season. The woodpecker feeds on southern pine beetles and other insects in standing trees. If too large an area is cut, or too many live infested trees are cut in the clearing process, the forage of the woodpecker will be significantly diminished. Nevertheless, the Fish and Wildlife Service maintains that cutting of infestations, if properly conducted, may benefit the woodpecker.

The plaintiffs urge that even this limited removal of infested areas by spot cutting immediately around a colony be enjoined because it has not been "scientifically" shown that the cutting is effective. Notwithstanding the absence of any discussion of efficacy in the EASs, at this stage the Court is inclined to presume that the cutting must have some effect in retarding the beetles' immediate attack on a colony. Common sense would seem to suggest this and the government's submissions contain several ancedotal reports as well as a scientific study that indicates that cutting is effective, at least for short-term control of spot infestations.

In addition, the extensive cutting challenged by the complaint has not been directed at infestations around colony trees. The cutting to protect colonies has been and, by all indications, will continue to be very limited. No colonies have been identified in three of the wilderness areas and there are only about 15–20 in the fourth. The record suggests that there are only a handful of colonies in this area that may be threatened by a heavy infestation that could lead to spot cutting. Costa Affd. ¶ 6.

Finally, whenever cutting of an infestation around a colony occurs the process is controlled by guidelines developed by the Fish and Wildlife Service as part of its extensive program developed to protect the red-cockaded woodpecker. These guidelines include restrictions on the amount of area that may be cut and the use of chemical treatments. *See* Cooke Affd., Ex. D, Wildlife Habitat Management Handbook, § 420.39b (1985).

■ As the government points out the beetle is voracious and will not obey a court injunction. Consequently, concern for the public's interest in preserving the red-cockaded woodpecker suggests that cutting should be allowed to go forward for this limited purpose. While many scientific questions remain unanswered and more information will be developed when a full NEPA study is made, prevention of cutting

to remove infestations of pine beetles immediately around colony trees of the red-cockaded woodpecker in conformity with Fish and Wildlife Service guidelines is unnecessary to assure preservation of the wilderness areas and favors this endangered species. The potential harm to the Fish and Wildlife Service's efforts to ensure the survival of the woodpecker and the public interest in protecting this endangered species indicates that limited spot cutting to save active woodpecker colonies should not be enjoined.

## Conclusion

Accordingly, a preliminary injunction will be entered on plaintiff's NEPA claim to enjoin cutting in wilderness areas but will be limited in recognition of the special public concerns in protecting the red-cockaded woodpecker. Plaintiffs' request for a preliminary injunction under the Endangered Species Act will be denied since they have failed to show a likelihood of success on the merits and have not shown that equitable considerations justify enjoining cutting to save woodpecker colonies. An appropriate preliminary injunction conforming to this memorandum is attached.

## ORDER

It appearing that for the reasons set forth in the accompanying Memorandum the motion for preliminary injunction filed herewith should be granted in part, it is

ORDERED that the defendants, their agents, representatives and others acting on their behalf are enjoined until further order of this Court from cutting any trees pursuant to the southern pine beetle control program in the four wilderness areas known as Black Creek Wilderness area, Leaf Wilderness area, Caney Creek Wilderness area and Kisatchie Hills Wilderness area, provided that the prohibition of this preliminary injunction does not apply to cutting to control beetle infestations in or near active red-cockaded woodpecker colony sites if said cutting is

(a) undertaken for the sole purpose of preventing harm to the red-cockaded woodpeckers, *and*

(b) conducted in strict accordance with the guidelines presently established by the Fish and Wildlife Service's Wildlife Habitat Management Manual, *and*

(c) preceded by due written notice to the Fish and Wildlife Service.

Plaintiffs' motion for a preliminary injunction under the National Environmental Policy Act is in all other respects denied. Plaintiffs' motion for a preliminary injunction under the Endangered Species Act is denied. It is further,

ORDERED that if defendants complete a programatic or site-specific Environmental Impact Statement covering the impact of the southern pine beetle program in any or all of the four wilderness areas named above, plaintiffs shall within thirty (30) days show cause, if any, why this preliminary injunction should not be modified or vacated, and it is further

ORDERED that, pursuant to Fed.R. Civ.P. 65(c), the plaintiffs shall post security of twenty dollars ($20.00) cash or bond.