**SIERRA CLUB and The Wilderness Society, Plaintiffs,**

**v.**

**Richard E. LYNG, et al., Defendants.**

**Civ. A. No. 85–2226.**

United States District Court, District of Columbia.

June 16, 1987.

Douglas L. Honnold, Denver, Colo., Eric P. Jorgensen, Washington, D.C., for plaintiffs.

Charles W. Brooks, Dept. of Justice, Washington, D.C., for defendants.

Fred A. Slimp, III, Robin L. Rivett, Sacramento, Cal., Robert A. Kirshner, Washington, D.C., for Louisiana Forestry Assn. (amicus).

## MEMORANDUM

GESELL, District Judge.

By their complaint filed July 12, 1985, Sierra Club and The Wilderness Society challenged the legality of a program initiated by the United States Forest Service under the direction of the Secretary of Agriculture to control infestations of the Southern Pine Beetle in federally designated Wilderness Areas located in Arkansas, Louisiana and Mississippi.[1] They claimed that the program was being conducted without initial development of an Environmental Impact Statement ("EIS"), in violation of the National Environmental Policy Act, 42 U.S.C. §§ 4321–4347 (1982); that it violated the Endangered Species Act, 16 U.S.C. §§ 1531–1543 (1982), by harming the Red-Cockaded Woodpecker, an endangered species which inhabits some of these areas; and that the extensive tree-cutting and chemical-spraying campaign involved was prohibited under Section 2 of the Wilderness Act, 16 U.S.C. §§ 1131–1136 (1982), which declares our national policy to protect designated Wilderness Areas and their natural ecology.

By Memorandum and Order of July 31, 1985, the Court preliminarily enjoined the program in the areas involved, subject only to an exception permitting limited cutting of trees immediately surrounding active woodpecker colony sites to protect the woodpeckers, under closely monitored conditions. *See Sierra Club v. Block,* 614 F.Supp. 488 (D.D.C.1985). Adjudication of plaintiffs' other claims was deferred pending development by the Forest Service of the Department of Agriculture of an EIS on the program. On March 6, 1987, under the direction of the Secretary of Agriculture, the Chief of the Forest Service published a three-volume Final Programmatic EIS ("FEIS") on the Service's program for short-term beetle control, and a Record of Decision ("ROD") reviewing the control alternatives considered and indicating the final agency action was published on April 6, 1987.[2]

The case is now before the Court for final disposition. Defendants have moved for summary judgment on all remaining issues. Plaintiffs do not oppose defendants' motion with respect to the National Environmental Policy Act claim, and the Endangered Species Act claim is moot, thus leaving only the Wilderness Act claim for discussion.[3] They have cross-moved for summary judgment on this claim, and the Court has heard argument on the motions. Amicus curiae Louisiana Forestry Association has filed an opposition to plaintiffs' motion.

The Secretary's ROD greatly narrows the scope of the beetle control program in the Wilderness Areas from that in effect when this litigation began. The Forest Service previously authorized the cutting of thousands of acres of wilderness pineland in an attempt, among other things, to create "buffer" areas against the spread of beetles—a process seriously unsettling to the values underlying the Wilderness Act.

---

**1.** These are: Caney Creek Wilderness Area, Ouachita National Forest, Arkansas; Kisatchie Hills Wilderness Area, Kisatchie National Forest, Louisiana; Black Creek Wilderness Area, De Soto National Forest, Mississippi; and Leaf Wilderness Area, De Soto National Forest, Mississippi.

**2.** The FEIS and ROD address beetle-control efforts in the fourteen states comprising the Forest Service's Southern Region, in both wilderness and non-wilderness areas. They include specific analyses of the effects of control in fifteen Wilderness Areas, including those involved in this suit.

**3.** By promulgating the FEIS, defendants have satisfied plaintiffs' National Environmental Policy Act claim, which focused only on the failure to conduct such a study; the adequacy of the FEIS is not before the Court. The parties agree that the Endangered Species Act claim is moot.

*See Sierra Club v. Lyng,* 662 F.Supp. 40, 42 (D.D.C.1987); *Sierra Club v. Block, supra,* 614 F.Supp. at 490, 493.

The Forest Service ultimately adopted the fourth of nine alternatives considered in detail in the FEIS, relating to beetle-control action within the Wilderness Areas.[4] Control efforts will be made under the program only: (1) to protect established woodpecker colony sites in immediate foraging areas;[5] and (2) to protect "State and private lands, and high value Federal forest resources,"[6] excluding federal land being used for commercial timber operations. This alternative contemplates "spot-control" techniques confining cutting in the Wilderness Areas to edges contiguous to neighboring property.[7] Cutting will be allowed only if a spot infestation of beetles is located within one-quarter mile of bordering non-wilderness lands, and a biological evaluation predicts the spot will expand into neighboring lands to be protected and cause unacceptable damage. A number of other cautionary factors must be considered in each site-by-site specific analysis prior to cutting. ROD, at 6–7.

The Forest Service emphasizes that under this selective approach, beetle control will be the exception; natural forces will be allowed "to play their role in the wilderness ecosystem," and "[i]t is only when these natural forces are predicted to threaten an essential [woodpecker] colony or cause unacceptable damage to specific resources adjacent to the wilderness that control in wilderness may be taken." ROD, at 1. It is emphasized that control efforts will be made only after detailed site-specific analysis.

4. Less intrusive options considered were those of allowing no cutting, and of allowing cutting only for the benefit of essential woodpecker colony sites. The more intrusive options considered were to allow cutting in the one-quarter mile boundary area also to benefit Federal commercial timberland, and to allowing cutting throughout the wilderness. *See* ROD at 5–8.

5. Cutting to protect woodpecker colonies will be allowed only in consultation with the Fish and Wildlife Service where a colony site is active, spread of beetles will threaten the site within 30 days, and successful control can be predicted. No such cutting is presently contemplated.

Decisions on boundary cutting will take into account both the value of adjacent land and of the wilderness qualities damaged by control methods, and must be premised on a reasonable prediction that control will be effective. The Court has been assured, at argument on the motions, that no control efforts will be initiated in a Wilderness Area unless the owner of adjacent land to be protected has taken reasonable steps on the adjacent land to combat spread of the beetle and will continue such efforts. The public will be kept informed of control efforts and may object to site-specific control decisions. ROD, at 12–13.

The action of the Secretary is taken pursuant to Section 4(d)(1) of the Wilderness Act, 16 U.S.C. § 1123(d)(1) (1982), which authorizes the Secretary to carry out "such measures [within Wilderness Areas] ... as may be necessary in control of fire, insects, and diseases, subject to such conditions as the Secretary deems desirable." In an opinion issued January 14, 1987, interpreting this Section, *Sierra Club v. Lyng, supra,* the Court held that although it grants the Secretary wide discretion in managing Wilderness Areas considered in isolation, that discretion is limited where Wilderness Areas are being adversely affected solely for the benefit of adjacent property interests. It noted that in such circumstances "the Secretary is not managing the wilderness but acting contrary to wilderness policy for the benefit of outsiders." *Id.* at 3–5. Although clearly permitted to take such action, as he has with respect to the beetle, the Court viewed the Act as imposing on the Secretary an affirmative burden of justifying his actions "by demonstrating they

There are very few colonies in these areas. *See* ROD at 11–12, 17, 27.

6. I.e., "recreation sites, scenic vistas, sensitive watersheds, or seed orchards." *See* ROD at 6.

7. Use of three types of control is contemplated under the program: cut-and-remove, in which infested trees and a buffer zone of uninfested trees are cut and hauled to be sold; cut-and-leave, involving similar cutting but no removal of trees; and cut-and-spray, involving similar cutting and spraying of pesticides by hand applicator.

are necessary to effectively control the threatened outside harm that prompts the action being taken." *Id.* at 5–6.

■ Plaintiffs do not challenge this interpretation of Section 4(d)(1), but rather persist in urging that the Secretary has not demonstrated that any boundary cutting of Wilderness Areas for the benefit of adjacent state and private timberland is "necessary" within the meaning of the Section.

Plaintiffs argue that no action by the Secretary can be deemed "necessary" unless the Secretary has first proven by scientific evidence that the contemplated spot-control cutting will be further effective in accomplishing the desired objectives. They seize on a dictionary definition of "necessary," arguing that it can only mean "essential to a desirable … end," and urge that if control measures intruding on wilderness values have not been scientifically proven effective, by definition they cannot be necessary—i.e., essential—to control beetles.

Plaintiffs suggest the Secretary has little or no basis for concluding that the various spot-control methods that may be employed in the program will have any significant effect in controlling the spread of beetles to contiguous areas, and they attack past studies of control methods as scientifically unsophisticated, emphasizing that only area-wide control efforts can check the beetles. They note that in the regions of the country where spot control is contemplated under the program, beetles are generally present in both wilderness and non-wilderness areas, in varying degrees. Thus, the beetle does not present a natural hazard present only in Wilderness Areas that uniquely threatens uninfested adjacent lands; rather, it is indigenous to pineland areas generally, with beetles spreading back and forth between wilderness and non-wilderness land. Plaintiffs conclude that if control methods are adopted at all, they must be designed to check spread of the beetle in an entire area of pineland, because there is no other way of scientifically ensuring that even successful spot control applied in the border of a Wilder-

ness Area will have lasting protective benefit to adjacent lands.

The degree of effectiveness of the spot-control methods to be employed under the program does remain in doubt. The record establishes considerable differences of opinion among biologists and other scientists studying the problem. The Secretary stresses the narrowness of the control allowed under the program, and the fact that a site-specific analysis must be employed before each control effort is undertaken. He cites numerous prior control efforts as supporting his view that the methods of spot control employed in the program have efficacy, and has concluded that the program will minimize significant harm from the spread of beetles.

Whether the Secretary has met his burden, on this record, of justifying intrusion on wilderness values for the benefit of adjacent landowners depends initially upon how Section 4(d)(1)'s allowance of "necessary" measures is interpreted. If plaintiffs are correct that only measures which are proven to be fully successful in effectively preventing the spread of beetles in an entire area are to be allowed, then the Secretary has failed to meet his burden; he admits that effective area-wide control measures have not yet been identified. If the statute incorporates a less stringent necessity standard, however, the record will support the Secretary's judgment.

Plaintiffs read the Act too broadly. First, there is no ground for concluding that Congress used the term "necessary" in the absolute sense urged by plaintiffs. Under the statute, various measures are authorized to the extent that they "may be necessary in the *control* … of insects…." The most natural reading of the Section focuses on the phrase "necessary in the control." In this context "necessary" simply embraces measures "needed to achieve a certain result or effect," *American Heritage Dictionary of the English Language* 877 (1981)—that is, measures that are needed as part of a program designed to control, in the sense of restrain or curb, beetle infestations. *Cf. McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 421, 4 L.Ed. 579

(1819) (construing the necessary and proper clause of art. I, § 8, cl. 18, as sanctioning "all means which are appropriate, which are plainly adapted to [the desired] end").

The pertinent section of the statute is therefore most reasonably construed as allowing the Secretary to use measures that fall short of full effectiveness so long as they are reasonably designed to restrain or limit the threatened spread of beetle infestations ˙ from wilderness land onto the neighboring property, to its detriment.

■ The degree of efficacy of various control methods is not to be debated between various scientists and resolved before this Court. The Secretary's judgment that the control measures authorized are reasonably efficacious is entitled to respect under Section 10 of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) (1982), unless shown to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[8] Although the Secretary has not conducted the most elaborate studies of the proposed measures that are scientifically possible, and perhaps would have welcomed funds enabling him to do so,[9] the Court is satisfied that his judgment is reasonable given the information now available from the past actual experience of the Forest Service in combating the beetle threat, and available scientific opinion. Of great importance is the fact that the effectiveness of these measures will ultimately be determined by specific study of each potential spot-control site, and a decision to cut does not rest upon the promulgation of the Secretary's underlying policy decision alone.[10]

One further point must also be stressed. The Secretary's burden under Section 4(d)(1) affirmatively to justify control actions taken for the benefit of adjacent landowners is grounded on the need to ensure that wilderness values are not unnecessarily sacrificed to promote the interests of adjacent landowners which Congress authorized the Secretary to protect. The Secretary has now made clear that unless adjacent landowners and federal authorities responsible for neighboring lands are following all reasonable means for combating beetles, the well-settled policies governing preservation of Wilderness Areas will not be compromised. Vigorous control efforts along the borders of wilderness land will be undertaken, therefore, only when met by equally vigorous efforts on adjacent land, ensuring that the burden of beetle control will not fall disproportionately on the Wilderness Areas. Those who seek protection of their lands must demonstrate to the Forest Service a willingness to share the burden of acting in a manner that will minimize any necessary intrusions upon wilderness values.

There are no material facts in dispute. The Secretary has met his burden. The Secretary's action is rational and not arbitrary. It constitutes a proper exercise of his discretion and contemplates action consistent with the requirements of the Wilderness Act as interpreted by the Court. Accordingly, defendants' motion for summary judgment is granted on all issues

---

**8.** Plaintiffs rely on this standard of review in their complaint, and recent decisions of the Court of Appeals make clear that there is no basis for applying a different standard here. *See, e.g., National Trust for Historic Preservation in the United States v. Dole,* 819 F.2d 1164, 1169 (D.C.Cir.1987) (per curiam); *National Audubon Soc'y v. Hester,* 801 F.2d 405, 407 (D.C.Cir.1986) (per curiam).

**9.** The lack of such studies was accounted for on the grounds of scientific feasibility and cost in the FEIS, at 2–20 to 2–21.

**10.** Plaintiffs' claim that the Secretary has himself admitted in the ROD, at 20, that the proposed spot-control measures are ineffective, is incorrect. The ROD excerpt involved states that "[w]e are unable to determine whether our control methods improve the areawide situation...." This statement refers only to continuing questions of the effective scope of treatment measures. Specifically defending the efficacy of the measures used in the program, the paragraph continues: "given the evidence that individual spots are successfully treated, and the absence of evidence that spot treatments make the areawide situation worse, ... the net effect of the ... program is positive" in the sense of limiting tree mortality caused by spread of beetles. *Id.*

The ROD as a whole pays close attention to the Court's specification of the Secretary's burden. *See* ROD at 23–28.

except the Endangered Species Act claim, which is moot, and plaintiffs' motion for summary judgment is denied. Each side shall bear its own costs. An appropriate Order is filed herewith.

### ORDER

Upon consideration of defendants' motion for summary judgment on all issues and plaintiffs' cross-motion for summary judgment on the Wilderness Act claim, and it appearing that the parties are in agreement that the National Environmental Policy Act has been satisfied and that the Endangered Species Act claim is moot, it is, for the reasons stated in an accompanying memorandum, hereby

ORDERED that defendants' motion for summary judgment on the Wilderness Act and National Environmental Policy Act claims is granted, and the complaint is dismissed, with prejudice; and it is further

ORDERED that plaintiffs' cross-motion on the Wilderness Act claim is denied.