**SIERRA CLUB, a California non-profit corporation, and League for Coastal Protection, a California non-profit corporation, Plaintiffs,**

v.

**John O. MARSH, Secretary of the Army; Colonel Fred Butler, District Engineer of the U.S. Army Corps of Engineers; Elizabeth Dole, Secretary of Transportation; Ray A. Barnhart, Administrator of the Federal Highway Administration; Leo J. Trombatore, Director of the California Department of Transportation; County of San Diego; City of Chula Vista; Donald P. Hodel, Secretary of the Interior; and Santa Fe Land Improvement Company, Defendants,**

**And Related Cross–Actions.**

**Civ. No. 86–1942–GT(IEG).**

United States District Court, S.D. California.

May 13, 1988.

Laurens Silver, Sierra Club Legal Defense Fund, San Francisco, Cal., for plaintiffs.

Donald A. Carr, Eileen Sobeck, Dept. of Justice, Washington, D.C., William Grauer, Gray Cary Ames and Frye, Robert L. Meyer, Daniel J. Wallace, Barbara Baird, Donald R. Worley, San. Diego, Cal., for defendants.

## MEMORANDUM DECISION AND ORDER

GORDON THOMPSON, Jr., Chief Judge.

This matter came before the court, the Honorable Gordon Thompson, Jr., Chief Judge, presiding, for hearing Motions to Dismiss, or Alternatively for Summary Judgment, Chula Vista's Cross–Claim and for Approval of the Proposed Settlement Agreement. On April 5, 1988, the court heard oral argument on the motions. Laurens Silver appeared for Plaintiffs SIERRA CLUB and LEAGUE FOR COASTAL PROTECTION; Eileen Sobeck appeared on behalf of the FEDERAL DEFENDANTS; Donald Worley for the Defendant SANTA FE LAND IMPROVEMENT COMPANY, Robert L. Meyer for defendant CALTRANS, Barbara Baird for the COUNTY OF SAN DIEGO, and William Grauer for defendant and cross-claimant CHULA VISTA.

At the hearing, the court ruled that the motion to dismiss would be construed as a motion for summary judgment. Following the hearing the court issued an order permitting the parties to engage in an expedited discovery process for one week. CHULA VISTA was granted until April 14, 1988, to file any additional opposition papers and supporting documents. The moving parties had until April 19, 1988 to submit additional reply materials. A hearing was held on April 25, 1988. The same individuals appeared and were content to rest on their motion papers. The matter was then submitted for decision.

## FACTS

This case arose out of the construction of a combined flood control and highway improvement project (the "Combined Project") undertaken by Caltrans and the Army Corps of Engineers ("Corps") at the border of Chula Vista and National City. At the time the case was filed, project construction was proceeding without the acquisition of the 178 acres of mitigation land previously determined to be necessary to mitigate the impacts of the Combined Project on two endangered bird species.

Plaintiffs sought and, in July 1987, eventually received an injunction barring all construction on the project until the Corps reinitiated consultation with the Fish & Wildlife Service ("FWS" or "Service"). The injunction further prohibited any construction west of Interstate 5 until the mitigation lands are transferred or the Federal Defendants cross-claim is otherwise resolved. That cross-claim seeks specific performance of the Section 221 agreement entered on December 18, 1984, between the Corps and the project's local sponsor, the County of San Diego. In that agreement the County promised to acquire and transfer the mitigation lands within a year in consideration for the Corps' commencing construction on the flood control channel. The County has failed to perform.

On August 1, 1986, the County, the City of Chula Vista and the landowner, Santa Fe Land Improvement Company ("SFLI"),

signed an escrow agreement that conditioned transfer of the land upon the Corps' issuance of permits needed to develop adjacent private lands owned by SFLI and reservation of seven easements across the mitigation land itself. Transfer of the land without the easements and conditions would preclude development of Gunpowder Point and "D" Street Fill as currently specified by the Local Coastal Plan ("LCP"). The Corps and the FWS contended that the conditions of the escrow substantially diminished, if they did not destroy, the use of the acreage as mitigation land.

Since the court entered the injunction, it has permitted Chula Vista to file a cross-claim. The cross-claim's objective is to prevent the transfer of SFLI's land on any terms or conditions other than those consistent with the development set forth in its LCP.

The court and parties have thus been faced with two diametrically opposed positions: plaintiffs and the FWS argue that transfer of the land cannot proceed with the easements and conditions in the escrow agreement; Chula Vista maintains no transfer can occur without them. The Federal Defendants, Caltrans, SFLI and Chula Vista Investment Company ("CVIC")[1] have chosen to make their peace with the plaintiffs. These parties have reached a proposed settlement regarding transfer of the land. In order to effectuate their settlement, they now seek summary judgment on Chula Vista's cross-claim and the court's approval of the proposed agreement.

DISCUSSION

I. Motion for Summary Judgment

Summary judgment is appropriate when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The burden of establishing the non-existence of a "genuine issue" is on the party moving for summary judgment. 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure, § 2727, p. 121 (2d ed. 1983) (citing cases). In reviewing the motion, the

court must make all inferences in favor of the party opposing the motion. *Id.* at 124–28.

By way of its cross-claim, Chula Vista seeks: (1) a declaratory judgment that the 178 acres not be transferred, disposed of, or used in a manner inconsistent with its LCP; (2) a preliminary and permanent injunction restraining any party to this lawsuit from attempting to transfer the 178 acres in a manner inconsistent with the LCP without first obtaining a permit from the City; (3) that the Federal Defendants obtain no relief on their cross-claim seeking transfer of the mitigation lands without reservation of easements; and (4) attorneys fees and costs. The complaint has three bases for the relief requested: the city's permit authority; its property rights in easements and licenses through the 178 acres; and an estoppel claim against the Federal Defendants.

### A. The City's Permit Authority

Chula Vista's cross-complaint seeks an injunction restraining any party to this lawsuit from attempting to transfer title to the mitigation land without a development permit from the City. The Settling Parties contend they need not obtain a permit because the transfer of land contemplated by the settlement falls under an exception to the statutory definition of development. Alternatively they argue the City cannot impose conditions on the power of the United States to acquire land under the Endangered Species Act ("ESA").

#### 1. Development Permits Under the California Coastal Act

The State of California requires, "[a]ny person wishing to perform or undertake any development in the coastal zone ... [to] obtain a coastal development permit." Cal.Pub.Res.Code § 30600. The state defines development as:

[c]hange in the density or intensity of use of land, including, but not limited to, subdivision pursuant to the Subdivision

---

**1.** CVIC holds an option to buy the land held by SFLI and is seen as a necessary party to the conveyance of the land.

Map Act (commencing with Section 66410 of the Government Code), and any other division of land, including lot splits, *except where the land division is brought about in connection with the purchase of such land by a public agency for public recreational use.*

Cal.Pub.Res.Code § 30106 (emphasis added).[2]

California has neither legislatively defined nor judicially construed "public recreational use." Other jurisdictions have held that "recreational purposes" encompass the conservation of natural beauty and the preservation of historic sites. *Scenic Hudson Preservation Conference v. Federal Power Commission*, 354 F.2d 608 (2d Cir. 1965), *cert. denied sub nom. Consolidated Edison Co. v. Scenic Hudson Preservation Conference*, 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1966). *See also Namekagon Hydro Co. v. F.P. Co.*, 216 F.2d 509, 511–12 (7th Cir.1954) (holding the ability to see wildlife in a natural setting was a recreational purpose). A similar interpretation of the phrase is warranted under the California Coastal Act given the Act's express purpose to facilitate and encourage the conveyance of coastal land to public agencies for "park, recreation, fish and wildlife habitat, or scientific study ..." Cal.Pub.Res.Code § 31351.

The proposed conveyance will serve recreational purposes. Under the terms of the Settlement Agreement and Escrow Instructions, the landowner will turn over the original mitigation lands and some additional parcels to the United States. FWS will manage the land for the government as a wildlife refuge. These lands provide habitat for a variety of plants and animals, as well as for two rare and endangered species, the Light-footed Clapper Rail and the California Least Tern. *Sierra Club v. Marsh*, 816 F.2d 1376 (9th Cir.1987).

The marshlands are particularly valuable for the study of natural history. EIS at A1–11, 12. The purpose of the recently-opened Nature Interpretive Center on Gun-

powder Point is the study of the natural history of the marsh system. One of the ways in which patrons study the marsh is through the use of telescopes and viewing platforms looking out into the marsh. See Exhibit A to Plaintiffs' Memoranda in Support of Motion to Dismiss, Nature Interpretive Center Pamphlet. The Nature Interpretive Center would lose its rationale for existence without the preservation of the marshlands.

2. The City's Ability to Impose Conditions on the Federal Government's Power to Acquire Land Under the ESA

■ Even if the proposed land transfer were found to fall within the definition of "development," the court would not subject the United States to the City's permit process. Federal courts are not required to apply relevant state law when that law is hostile to a Congressionally declared program of national scope. *North Dakota v. United States*, 460 U.S. 300, 318–19, 103 S.Ct. 1095, 1105–06, 75 L.Ed.2d 77 (1983); *United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 594–97, 93 S.Ct. 2389, 2397–99, 37 L.Ed.2d 187 (1973) (state law not applied where it would abrogate terms of prior land acquisition of the Migratory Bird Conservation Act, 16 U.S.C. § 715 *et seq.*). *See also United States v. Albrecht*, 496 F.2d 906, 911 (8th Cir.1974) (state law barring conveyance of real property not applicable where it would hinder national program of acquiring land for waterfowl production areas), cited and distinguished on its facts in *Cortese v. United States*, 782 F.2d 845, 849 (9th Cir.1986) (Kennedy, Circuit Judge).

The permit scheme set up by the California Coastal Act, Cal.Pub.Res.Code § 30000 et seq. is hostile to federal interests under the circumstances present in this case. In June 1987, while this case was pending, Chula Vista passed City Resolution No. 13166 which prohibits transfer of the mitigation land to any party other than the

---

**2.** Twenty-four hours after the final hearing on these matters counsel for Chula Vista contacted the court requesting to file a short additional memoranda. In that memoranda, Chula Vista makes a new argument governing the interpre-

tation of § 30106. The court has considered that argument and rejects it for the reasons stated in the Plaintiffs' Reply brief filed April 29.

California Department of Fish and Game. See Exhibit to Plaintiffs' First Amended Complaint. When the resolution is read in conjunction with the LCP and the arguments made in support of the City's opposition, it is clear that the City would not grant the United States the permit it seeks, or if it did so, would condition its issuance on terms which would render the acquisition meaningless.

Under the contemplated settlement agreement, the United States will accept the voluntary transfer of the 178 acres and other lands pursuant to its authority under the Endangered Species Act ("ESA"). 16 U.S.C. § 1534.[3] The language, history and structure of the ESA "indicates beyond doubt that Congress intended endangered species to be afforded the highest of priorities." *TVA v. Hill*, 437 U.S. 153, 174, 98 S.Ct. 2279, 2292, 57 L.Ed.2d 117 (1978). The ESA is unquestionably a "Congressionally declared program of national scope."

This case warrants the application of the exception established in *Little Lake Misere* and *North Dakota v. United States*. The federal government is trying to discharge its obligations under a high priority federal program to protect endangered species. A private landowner wants to donate the land to the government to effectuate these purposes. The City of Chula Vista has passed a local resolution in an attempt to stymie any transfer of the property which it believes does not serve the City's interests, which it has defined as development in strict accordance with its LCP. The court will not allow the City to use its permit authority to obtain an injunction barring the transfer of land except on terms consistent with its LCP, as requested in the cross-claim.

## B. *The City's Interest in License and Easement Rights*

Chula Vista alleges its license and easement rights in the mitigation land are at risk unless the court restrains any transfer of land inconsistent with its LCP, or restrains any transfer in the absence of a development permit issued by the City. Chula Vista's only license and easement rights consist of an easement through the 178 acres for access to the Nature Interpretive Center and a license for utility purposes.[4] SFLI granted both of these property interests to the City on June 30, 1986. These rights have been recorded.

Any transfer of the mitigation land will be subject to the City's recorded property interests. The Settling Parties have explicitly recognized the presence of those interests. Escrow Agreement, Paragraph 2.1(i). Because the City has failed to show any of its property rights have been or threaten to be impaired by any transfer of the land, the court will grant summary judgment for the settling parties on this claim. The City may always contest any future action that it believes impinges upon its property rights.

## C. *Equitable Estoppel*

Chula Vista also maintains the transfer of the mitigation lands should not occur except under the terms the City provides because the Federal Defendants led the City to "believe that its Local Coastal Program was and is consistent with the federal Combined Project and federal statutes applying to said project." Cross–Complaint,

---

**3.** 16 U.S.C. § 1534(a) provides:

The Secretary, and the Secretary of Agriculture with respect to the National Forest System, shall establish and implement a program to conserve fish, wildlife, and plants, including those which are listed as endangered species or threatened species pursuant to section 1533 of this title. To carry out such a program, the appropriate Secretary—
(1) shall utilize the land acquisition and other authority under the Fish and Wildlife Act of 1956, as amended [16 U.S.C.A. § 742a et seq.], the Fish and Wildlife Coordination Act, as amended [16 U.S.C.A. § 661 et seq.] and the migratory Bird Conservation Act [16 U.S.C.A. § 715 et seq.], as appropriate; and
(2) is authorized to acquire by purchase, donation, or otherwise, lands, waters, or interest therein, and such authority shall be in addition to any other land acquisition authority vested in him.

**4.** Although the City has asserted an interest in "implied easements," it never identified any such easements although given an opportunity to do so. Accordingly, the court concludes that no such easements exist.

¶ 18 [5]. The City further alleges that in detrimental reliance on the federal defendants' statements and conduct, it spent large sums of money developing its LCP and the Nature Interpretive Center.

1. Evidence in Support of Estoppel

■ In support of its claims, Chula Vista refers to the declarations of its Mayor, Gregory Cox, and its Redevelopment Director, Paul Desrochers, and the deposition testimony of federal agency employees Warren Hagstrom, Richard Harlacher and Christopher Kronick.[6]

Mayor Cox asserts that since 1982 he has had "numerous communications" with federal employees in which the employees indicated the City would be entitled to "some development rights in the Gunpowder Point and 'D' Street Areas." Supplemental Cox Declaration, ¶ 2. Specifically, he says that on April 27, 1982, he attended a meeting with William Gianelli, the Assistant Secretary of the Army for Public Works, and Charles LeManager, a representative of SFLI. At that meeting LeManager:

> [r]epresented a willingness to dedicate a [sic] 188 acres of wetlands in the Bayfront for the mitigation of the federal project with the understanding that the landowner would be able to proceed with development of the land consistent with the plan which was to be approved by the California Coastal Commission.

*Id.* In a meeting between the same individuals in April 1984 which followed the Coastal Commission's certification of the LCP, Gianelli purportedly agreed that the dedication of the land was in consideration for SFLI's development of its Bayfront land consistent with the LCP. *Id.* More generally, Cox avers that between 1982 and

the present, Corps and FWS representatives continued to encourage the City to expend monies for planning and environmental studies associated with Gunpowder Point and "D" Street Fill areas. *Id.* at ¶ 3. *See also* Supplemental Declaration of Desrochers, ¶ 3.

The City claims it also relied upon other instances of conduct by various federal officials, including: former Combined Project Manager Warren Hagstrom's efforts to mediate disputes governing placement of a bike path, fence and surrounding vegetation; Project Manager Chris Kronick's Fall 1987 discussion with the City about under what circumstances federal permits would and would not be needed for implementation of the LCP; the local Corps' regulatory branch head Richard Harlacher's understanding that Chula Vista would be going forward with permit applications after a NEPA scoping meeting in March 1987; and the deposition testimony that certain federal agency representatives never heard FWS personnel say anything adverse about the LCP.

2. Discussion

Ordinarily a party seeking to estop another party must show:

1. The party to be estopped knows the facts;

2. The party to be estopped intends that his conduct shall be acted on or must so act that the party asserting estoppel has a right to believe it is so intended;

3. The latter must be ignorant of the facts; and

4. He must rely on the former's conduct to his injury.

---

5. Chula Vista also seems to be asserting an estoppel claim based upon the parties' participation in certification procedures before the California Coastal Commission. Given the FWS's consistent opposition to the LCP before the Commission, this allegation is somewhat baffling. See Administrative Record 50, 51, 73.

6. Predictably, Chula Vista has claimed it has had inadequate time for discovery. The court notes that at least with respect to its estoppel claim, the City need not have conducted any discovery. A party alleging detrimental reliance

must, by definition, know what the other party did to induce such reliance.

Furthermore, the City has had ample opportunity to conduct discovery. It filed its cross-claim on October 30, 1987, but took no action until presented with this motion. Chula Vista has a duty to prosecute its claim or it will be subject to dismissal. Fed.R.Civ.P. 41(b); Local Rule 237. The existence of purported agreements to mediate, see discussion at pp. 18–19, do not obviate the need for the City to take some action.

*JAA v. United States I.N.S.*, 779 F.2d 569, 571 (9th Cir.1986). The Supreme Court has expressly left open the issue of whether the government may be estopped on any terms. *Heckler v. Community Health Services*, 467 U.S. 51, 60, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984). The Ninth Circuit has held that estoppel may run against the government if the party asserting estoppel can show, in addition to the traditional elements, that the government's actions constituted "affirmative misconduct,"[7] the actions "threatened to work a serious injustice ... and the public's interest would not be unduly damaged by the imposition of estoppel." *JAA*, 779 F.2d at 572.

Chula Vista's claim cannot survive a summary judgment motion on even the traditional elements of estoppel. Assuming that the facts are as the City represents, they do not establish that the City could have reasonably relied upon the asserted conduct. In order to rely upon material facts,

> [t]he truth concerning these material facts must be unknown to the other party claiming the benefits of estoppel, not only at the time of the conduct which amounts to a representation or concealment, but also at the time when that conduct is acted upon by him. If, at the time when he acted, such party had knowledge of the truth, or had the means by which with reasonable diligence could acquire the knowledge so that it would be negligence on his part to remain ignorant by not using those means, he cannot claim to have been mislead by relying on the representation or concealment.

*Heckler v. Community Health Services*, 467 U.S. at 59, n. 10, 104 S.Ct. at 2223, n. 10 (quoting Restatement (Second) of Torts § 810 at 219).

The court is flabbergasted by any assertion that Chula Vista could have relied upon the aforementioned conduct. Since 1977 the FWS has consistently expressed its concerns and reservations regarding Chula Vista's LCP in general and the development of Gunpowder Point, D Street Fill and the South Levee Road in particular. These concerns are amply documented throughout the Administrative Record ("A.R.") and include correspondence with the City itself (A.R. 43, 44, 45, 46, 47, 65), statements to the California Coastal Commission (A.R. 50, 51, 73), and to the Department of Commerce (A.R. 97 and 99).

For example, the FWS wrote the Coastal Commission in June 1977 to comment upon Chula Vista's then-proposed Bayfront Plan. A.R. 50. Like the approved plan, the proposed plan included development of the D Street Fill Area and a hotel/convention complex on Gunpowder Point. At that point, the Service had included those pieces of land for acquisition in a Draft Environmental Assessment. The Service concluded:

> The developments proposed by the City of Chula Vista (e.g. extension of Tidelands Avenue, a hotel and convention center on Gunpowder Point, including an access road across the marsh, development of "D" Street, etc.) appear to impact the upland/wetland interrelationship and the salt marsh system. The proposed projects require destruction of habitat which will foreclose biological planning options to preserve and/or enhance the public fish and wildlife resource values in the area. *It is our opinion that proposed developments would both separately and culmatively [sic] cause adverse effects to the integrity and long-term productivity of the Sweetwater Marsh ecosystem.*

A.R. 50 at p. 2 (emphasis added).

Prior to the Commission's approval of the LCP, FWS submitted detailed comments on the Plan to the City's Community Redevelopment Director, Paul Desrochers. A.R. 65. FWS later informed the Coastal Commission that the "LCP proposed developments that appear to be inconsistent with the preservation of biological values in the area." Id. at p. 2. After the Commission

---

**7.** Affirmative misconduct has been defined only as "something greater than negligence." *JAA*, 779 F.2d at 572.

certified the plan and had issued revised findings, FWS forwarded additional comments in protest on September 25, 1984. A.R. 73 ("[T]he certified Land Use Plan ... does not adequately protect the natural resources of the project area.") The City acknowledges the Service's remarks and its own strident opposition to them by letter dated October 1, 1984. A.R. 75. FWS has continued to object to aspects of the LCP since that time and has opposed the issuance of various federal permits needed to implement the LCP. *E.g.*, A.R. 10, Biological Opinion of March 6, 1986, on Proposed Levee Improvements. ("[T]he subject project is likely to jeopardize the continued existence of the light-footed clapper rail, California least tern, and saltmarsh bird's beak.")

Given this long history of FWS opposition to Chula Vista's LCP, the City cannot contend it was unaware of federal objections to the plan. In fact, the City has acknowledged these objections in its cross-claim,[8] as well as in written correspondence.[9] In the face of these objections, Chula Vista had a duty to inquire, at the very least, how the objections would affect the implementation of its plan.

■ Parties who deal with the government are expected to know the law and cannot rely on the conduct of a federal agent contrary to law. *Heckler v. Community Health Services*, 467 U.S. at 63, 104 S.Ct. at 2225. "[A]nyone entering into an arrangement with the government assumes the risk of having accurately ascertained that those who purport to act for the government do so within the scope of their authority." *Id.* at n. 17, 104 S.Ct. at 2225 n. 17, quoting *Federal Crop Insurance*

*Corp. v. Merrill*, 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947).[10] None of the employees mentioned by Chula Vista have the authority to waive compliance with federal statutes and permit processes. To the extent that any federal agent gave the City the impression the government "approved" of the Bayfront Plan, that agent was acting outside the scope of his authority. Chula Vista's reliance on any such agent's conduct cannot bind the government.

■ The court further holds Chula Vista's reliance unreasonable because the City relied upon oral statements or conduct rather than on written representations. In *Heckler v. Community Health Services*, the Court placed the burden of comprehending legal requirements squarely upon the party relying upon governmental conduct and refused to hold the Government responsible for ensuring that every bit of informal advice given by its agents in the course of a complex program is sufficiently reliable to justify the expenditure of substantial sums of money. 467 U.S. at 64, 104 S.Ct. at 2226. The Court also strongly suggested that the Government may never be estopped on the basis of oral advice or statements. *Id.* at 65, 104 S.Ct. at 2226. Written records reduce the possibility of fraud, require reflection and help to prevent government agents from exceeding their authority. *Id.* These concerns are all present in this case. Chula Vista could have avoided the consequences of its alleged reliance if it had secured either written assurances or clarifications from the federal agencies concerned.

Summary judgment shall be granted for the moving parties on the estoppel claim.

---

**8.** Paragraph 10 of the City's cross-claim reads: [A]ll parties in the instant action were aware of, and in some cases participated in the formulation of and/or opposition to the Local Coastal Program.

**9.** *E.g.*, A.r. 75.

**10.** Although this rule has been said to have its "greatest force" when used to protect the public fisc, *see Heckler v. Community Health Services*, 461 U.S. at 63, 104 S.Ct. at 2225, the court does not believe it loses its power in these circumstances. Here the government has sought to ensure the City's compliance with federal law,

particularly the Endangered Species Act. Congress has afforded the preservation of endangered species the highest of priorities. *TVA v. Hill*, 437 U.S. at 174, 98 S.Ct. at 2292. Moreover, Chula Vista has had the services of an attorney throughout the entire period concerning its LCP, unlike many plaintiffs seeking public benefits who presumably were unrepresented at the time when they sought and relied on the advice of government agents. *E.g.*, *Schweiker v. Hansen*, 450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981).

Chula Vista has not come forward with evidence demonstrating it reasonably relied upon the conduct of federal officials. First, even if the statements or conduct did induce the City to believe the Federal Defendants approved or tolerated the LCP, there is ample evidence that the City either knew or should have known the FWS had multiple, serious concerns about the plan. Second, the parties making the statements or conduct had no authority to bind the Federal Defendants and Chula Vista assumed this risk in relying upon their conduct. Third, Chula Vista relied on oral representations which may not serve as the basis for estopping the government in any circumstances, and was certainly unreasonable given the Service's objections, the complexity of the federal statutes and the amount of money involved. In fact, the evidence presented leads the court to believe that Chula Vista acted, not in reliance upon the conduct of federal officials, but in spite of it.

## II. Motion to Approve the Settlement

■ The Settling Parties have also requested the court to approve their stipulated settlement. Chula Vista objects: it claims that in addition to questions of fact that are raised by its cross-claim, the Settlement Agreement gives rise to additional causes of action for estoppel, violation of the Coastal Zone Management Act ("CZMA"), 16 U.S.C. §§ 1451 et seq., and violations of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 et seq. The City would like the Court to deny approval of the settlement agreement and force all parties to appear before a magistrate for a settlement conference.

Basically, the Settlement Agreement provides that SFLI and CVIC will place the mitigation. lands, Gunpowder Point, D Street Fill, and the F and G Street Marsh portions of their Bayfront property into escrow. Upon satisfaction of the escrow conditions, these lands will be conveyed to the United States for use as a wildlife refuge. In return, plaintiffs have agreed to dismiss its federal and state actions concerning the Combined Project and the Chula Vista Bayfront Project, with certain reservations. The United States has also agreed to dismiss its cross-claim against the County to the extent it seeks specific performance of the 221 agreement. The various cross-claims for damages caused by the injunction stopping work will remain open.

The settlement will not be effective and escrow will not close until certain conditions are satisfied. First, the Corps must issue certain permits to the landowner, which it has not guaranteed it will do. Second, Chula Vista's cross-claim must be disposed of with prejudice and any post-judgment relief must have become final. Third, this court must have approved the Stipulated Settlement.

### A. Standard of Review

The court reviews the stipulated settlement and dismissal pursuant to Fed.R. Civ.P. 41(a)(2). That rule permits voluntary dismissal of an action upon order of the court and upon such terms and conditions as the court deems proper. Dismissals are generally granted "unless the defendant would suffer prejudice other than the prospect of a second lawsuit or some tactical disadvantage." *New Mexico ex rel. Energy & Minerals Dep't v. U.S. Dep't of Interior*, 820 F.2d 441, 443 (D.C.Cir.1987) (quoting *Conafay v. Wyeth Laboratories*, 793 F.2d 350, 353 (D.C.Cir.1986)).

Nothing in the Stipulated Settlement warrants the denial of this motion. The City's cross-claim is protected by the terms of the agreement and the operation of Rule 41(a)(2). The agreement cannot become effective without a final resolution of Chula Vista's cross-claim. That action stands or falls on its own merits. The court need not have reached the result it did on the motion for summary judgment to grant this motion.

The City claims it has new causes of action as a result of the Stipulated Settlement. These claims merely comprise a possible second lawsuit and do not constitute the type of prejudice which would warrant denial of this motion. *Id.* Out of an abundance of caution and a concern for funda-

mental fairness, the court has reviewed the "new causes of action" and found the proposed claims to be either without merit or premature. In any event, they do not suggest that approving the stipulated settlement would be inappropriate, unfair, or cause Chula Vista to suffer something other than the prospect of more litigation.

## B. *Proposed New Causes of Action*
### 1. Equitable Estoppel

Chula Vista would like to amend its estoppel claim to add allegations that it relied on statements of Corps and Service employees who purportedly agreed to a mediation procedure. First, the deposition testimony provided by Chula Vista contradicts this assertion. At pages 28–30 of his deposition testimony, Christopher Kronick, a Project Manager for the Combined Project, states that no one ever agreed to formally mediate their disputes, but only agreed to pursue the possibility of mediation further. Secondly, this estoppel claim suffers from the same defects as the previously asserted estoppel action, reliance on an oral representation of a federal employee who did not have the authority to commit the Federal Defendants to a mediation process. *See Heckler v. Community Health Services,* 467 U.S. 51, 104 S.Ct. 2218.

### 2. Violations of the CZMA

■ Chula Vista also maintains the proposed settlement violates the CZMA. The CZMA obligates a federal agency conducting or supporting activities in the coastal zone to "conduct or support those activities in a manner which is, to the maximum extent practicable, consistent with approved state management programs." 16 U.S.C. § 1456 (emphasis added). The federal agency must provide the state agency with a consistency determination at "the earliest practicable time in the planning or reassessment of the activity ... at least 90 days before final approval of the Federal activity unless [both agencies] agree to an alternative notification schedule." 15 C.F.R. § 930.34.

Chula Vista will not suffer any legally cognizable prejudice if the settlement is approved prior to its bringing a claim under the CZMA. If approved, the settlement will cause the property to be put into escrow. The actual transfer of the land is contingent upon several future events which may or may not occur. The Federal Defendants have contacted the Commission to discuss the applicability of the consistency determination requirements. Federal Defendants' Exhibit 9, Letter to Coastal Commission dated 4/21/88. At this point, they appear to be fulfilling their obligations under the CZMA. The court cannot and will not assume that the federal government will not comply with its future statutory obligations. *See Conner v. Burford,* 836 F.2d 1521, 1528–29 (9th Cir.1988). *Cf. Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971) (agency action entitled to presumption of regularity).

It is not at all clear that a consistency determination will be necessary for the transfer of the lands to the FWS. *See Ono v. Harper,* 592 F.Supp. 698, 700 (D.Hawaii 1983) (mere transfer of land not an activity directly affecting the coastal zone). The Coastal Commission has notified the FWS that the proposed transfer "may be subject to the federal consistency review provisions of the [CZMA]." Plaintiffs' Response to Opposition of Chula Vista to Motion for Summary Judgment, Exhibit A, Letter from Commission dated 4/1/88. In that same letter the Commission noted that much of this land was previously subject to consistency review in connection with the combined project and implies that only review of the transfer of the additional parcels may be necessary.

■ Finally, Federal agencies only need to establish consistency with plans approved by the Secretary of Commerce under the CZMA. 16 U.S.C. § 1456(c)(1); 15 C.F.R. § 930.19. Chula Vista has admitted its LCP has not been approved by the Secretary of Commerce. Declaration of William Grauer, Exhibit M, Answer of City to Interrogatory No. 4. Any required consistency review should evaluate the transfer's compliance with the state program as approved and not with the City's LCP. Even if the Federal Defendants have violated the

CZMA, the settlement of this case will not prejudice Chula Vista's right to bring an action to enforce compliance with the statute.

### 3. NEPA Violations

■ The third proposed amendment would state a cause of action for NEPA violations. NEPA requires federal agencies to file an environmental impact statement ("EIS") before undertaking "major Federal action significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(c). The agency may issue a "Finding of No Significant Impact" in lieu of an EIS if it finds, based on an environmental assessment, that the proposed action will not significantly affect the environment. 40 C.F.R. § 1508.13. The agency's decision will be upheld on review if reasonable. *Conner v. Burford,* 836 F.2d at 1526.

The Federal Defendants have at least arguably discharged their NEPA obligations. Three Service officials have conducted an environmental review of the proposed land acquisition and concluded it does not trigger the need for an EIS. Federal Defendants' Exhibit 7; Declaration of William Grauer, Exhibit D, Answers of Federal Defendants to City's Interrogatories, Attachment A, Answer No. 8. Chula Vista is thus left with an action challenging the reasonableness of the agency's decision. The purpose of an EIS is to inform decisionmakers of the disruptive environmental effects of their proposals in an appropriate time frame. *Conner,* 836 F.2d at 1526–27. The court finds it unlikely that a no impact finding would be held unreasonable where the government seeks to acquire some additional parcels of land for environmental mitigation purposes.

It would be inconsistent with NEPA's purposes to allow the city to use NEPA to obstruct implementation of a settlement which will protect endangered species. *Cf. Pacific Legal Foundation v. Andrus,* 657 F.2d 829 (6th Cir.1981) (court refused to require EIS before federal agency listed mussel species as endangered under the ESA). *See also Sierra Club v. Block,* 614

F.Supp. 488, 492–94 (D.D.C.1985) (action benefitting an endangered species should not be automatically enjoined even if a NEPA violation has occurred). Congress enacted NEPA to promote the prevention or elimination of damage to the environment and to provide a mechanism for achieving these purposes. *Pacific Legal Foundation,,* 657 F.2d at 837. Moreover, the court will not assume the Federal Defendants will not comply with any NEPA obligations which may arise in the future. *Conner,* 836 F.2d at 1528–29.

Chula Vista also maintains it is entitled to review and contest a "full supplemental EIS." Regulations promulgated under NEPA mandate the preparation of a supplementary EIS if an agency makes substantial changes in the proposed action that are relevant to environmental concerns, or if there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts. 40 C.F.R. § 1502.9(c). The proposed settlement does not require the Corps or the FHWA to make any substantial change in the Combined Project; the only change the settlement effectuates is the foreclosure of the possibility of development on the additional land parcels. The federal agencies have determined that no supplemental EIS is needed. For the reasons stated earlier, the court believes it is unlikely that the agency decision would be held to be unreasonable.

In any event, the proposed NEPA Amendment, like the CZMA claim, presents the court with the anomalous situation in which a municipality is trying to use federal environmental laws as a means of protecting a plan for desired local commercial and residential development. The proposed NEPA claim merely raises the possibility of another lawsuit. This possibility should not block the settlement of the pending action. *Energy & Minerals Dep't,* 820 F.2d at 443.

### CONCLUSION AND ORDER

For the reasons stated above, the court grants the Motion for Summary Judgment

on Chula Vista's Cross–Claim and approves the stipulated settlement agreement.

IT IS SO ORDERED.