**SABINE RIVER AUTHORITY, Plaintiff,**

**Texas Water Conservation Association, Plaintiff–Intervenor,**

v.

**UNITED STATES DEPARTMENT OF INTERIOR, Donald Paul Hodel, in his official capacity as Secretary of Interior, United States Fish and Wildlife Service, Frank H. Dunkel, in his official capacity as Regional Director of the Fish and Wildlife Service, and Little Sandy Hunting and Fishing Club, Defendants,**

**The Sierra Club and the National Audubon Society, Defendants–Intervenors.**

**No. TX–87–36–CA.**

United States District Court, E.D. Texas, Texarkana Division.

Aug. 13, 1990.

William H. Burchette, Christine Ryan, Jorden Schulte & Burchette, Washington, D.C., and Carl Roberts, Longview, Tex., Frank R. Booth, Booth & Newsome, Austin, Tex., for Sabine River Authority and Texas Water Conservation Ass'n, respectively.

Ruth Harris Yeager, First Asst. U.S. Atty., Tyler, Tex., Lisa Hemmer, U.S. Dept. of Justice, Washington, D.C., Joseph I. Worsham, Dallas, Tex., for Federal defendants and Little Sandy Club, respectively.

Wendy S. Dinner, Washington, D.C., for Sierra Club and National Audubon Society.

## MEMORANDUM OPINION AND ORDER

PAUL N. BROWN, District Judge.

Pending before the Court are Motions for Summary Judgment filed by all parties. After carefully reviewing all of the motions and supporting briefs, the lengthy administrative record, and the applicable law, the Court finds that the motions of the defendants should be granted and those of the plaintiffs denied.

## I. BACKGROUND

The dispute in this case concerns the decision of the Department of the Interior's Fish and Wildlife Service ("FWS") to accept a conservation easement on 3800 acres of land owned by the Little Sandy Hunting and Fishing Club ("Club"). The FWS's acquisition of this easement conflicts with the plans of plaintiff Sabine River Authority ("SRA") to construct the Waters Bluff Reservoir. If constructed, the reservoir would inundate the lands encompassed by the easement.

Before acquiring the easement, the FWS prepared a draft environmental assessment ("EA") of the proposed acquisition pursu-ant to Department of Interior regulations implementing the review process mandated by the National Environmental Policy Act, 42 U.S.C. § 4332 ("NEPA"). (AR. P).[1] The FWS also conducted a public hearing on the proposed acquisition. (AR. I). Thereafter, the FWS issued a final EA recommending acquisition of the easement. (AR. D). The FWS also issued a "Finding of No Significant Impact" ("FONSI") setting forth the FWS's conclusion that NEPA did not require the FWS to prepare an environmental impact statement ("EIS") concerning its acquisition of the easement. (AR. G–79). The FWS then accepted the easement.

*Plaintiffs' Claims*

SRA contends that the FWS's FONSI and decision not to prepare an EIS concerning its acquisition of the easement violated the provisions of NEPA. SRA claims that the FONSI is erroneous because acquisition of the easement is a "major Federal action[ ] significantly affecting the quality of the human environment" that requires the preparation of an EIS. SRA also claims that the FWS's EA is inadequate in several respects and that this matter should be remanded to the FWS for further consideration. Finally, SRA alleges that the acquisition of the easement violated the Fish and Wildlife Act, 16 U.S.C. § 742a et seq. and the Refuge Recreation Act, 16 U.S.C. § 460k et seq., because the terms of the easement do not provide for a right of access for the public.

Plaintiff–Intervenor Texas Water Conservation Association ("TWCA") also contends that the FWS should have prepared an EIS concerning its acquisition of the easement. In addition, TWCA asserts that the FWS's Texas Bottomlands Hardwood Preservation Program ("Preservation Program") is itself a "major Federal action[ ] significantly affecting the quality of the human environment" and that the FWS should have prepared an EIS concerning the Preservation Program.

The FWS and the Defendant–Intervenors Sierra Club and National Audubon Society

---

1. "AR" refers to the Administrative Record.

contend that the FONSI is correct since the easement preserves the "environmental status quo" by prohibiting development on the land encompassed by the easement. The FWS also contends that its EA was adequate and that it was not required to prepare an EIS concerning the Preservation Program. Finally, the FWS asserts that the terms of the easement do not violate the provisions of either the Fish and Wildlife Act or the Refuge Recreation Act.

## II. STANDARD OF REVIEW

■ The standard of review that this Court must apply to this case is set forth in *State of Louisiana v. Lee*, 758 F.2d 1081 (5th Cir.1985), *cert. den.*, 475 U.S. 1044, 106 S.Ct. 1259, 89 L.Ed.2d 570 (1986).

> NEPA requires the preparation of an [EIS] whenever a major federal action significantly affecting the quality of the human environment is proposed.... Judicial review of an agency's decision not to file an [EIS] is governed by the rule of reasonableness ... whether the agency['s] decision not to develop an impact statement is reasonable and made objectively and made in good faith on a reviewable environmental record.... If the decision is reasonable, the determination must be upheld.

*Id.* at 1083.

The plaintiffs' burden in presenting a NEPA claim is also well-established.

> [T]he court must determine whether the plaintiff has alleged facts which, if true, show that the recommended project would materially degrade any aspect of environmental quality ... If the court concludes that no environmental factor would be significantly degraded by the project, [the] determination not to file the [EIS] should be upheld. On the other hand, if the court finds that the project *may* cause a significant degradation of some human environmental factor (even though other environmental factors are affected beneficially or not at all), the court should require the filing of an impact statement....

*Id.* at 1084.

The plaintiff "must establish only that the [defendant] was unreasonable in concluding there was no reasonable possibility that the proposed action would significantly degrade any environmental factor." *Id.* at 1085.

The Supreme Court has held that an agency's decision not to file an EIS should be reviewed under the "arbitrary and capricious" standard. *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, ——, 109 S.Ct. 1851, 1860, 104 L.Ed.2d 377 (1989). The Court suggested that there is little or no difference between this standard and the "reasonableness" standard that had been applied heretofore by courts in most of the circuits, including the Fifth Circuit. 490 U.S. at ——, 109 S.Ct. at 1861 n. 23. In applying this standard of review, a court "must consider whether the decision [not to prepare an EIS] was based on a consideration of the relevant factors and whether there has been a clear error in judgment". 490 U.S. at ——, 109 S.Ct. at 1861.

An agency's decision not to prepare an EIS may be erroneous for one of two different reasons. The evidence in the record may indicate that, "contrary to the FONSI, the agency's proposed action may have a significant impact on the human environment", or the record may show that the agency's NEPA review process was "flawed in such a manner that it cannot yet be said whether the [proposed action] may have a significant impact". *Fritiofson v. Alexander*, 772 F.2d 1225, 1238 (5th Cir. 1985). If a court finds that the proposed action may have a significant impact, the court should order the agency to prepare an EIS. *Id.* On the other hand, should the court determine that the agency's review was inadequate, the court should remand the case to the agency for further proceedings to correct the inadequacies. *Id.*

## III. REVIEW OF THE FONSI

■ An agency need not prepare an EIS for actions that do not "significantly affect[ ] the quality of the human environment". *Citizen Advocates for Responsible Expansion, Inc. v. Dole*, 770 F.2d 423, 432 (5th Cir.1985). In determining whether

particular agency actions "significantly affect[ ] the quality of the human environment", courts have analyzed an agency's action to determine whether those actions may alter the "environmental status quo" or cause a "significant degradation of some human environmental factor".

A federal agency proposing an action must prepare an environmental impact statement if that action may cause "a change in the [environmental] status quo." *Sierra Club v. Hassell,* 636 F.2d 1095, 1099 (5th Cir.1981).[2] Any agency action that *"may* cause a significant degradation of some human environmental factor" also requires the preparation of an EIS. *State of Louisiana v. Lee,* 758 F.2d at 1086. *Lee* and *Hassell* do not set forth different tests, however, since any action that "may cause a significant degradation" of the environment certainly may cause "a change in the environmental status quo". Whether a federal agency's action "may cause a significant degradation of some human environmental factor" is analyzed in light of the "environmental status quo" existing at the time of the proposed action. *Id.*

The principle underlying the determination of whether an agency's action may "significantly affect[ ] the quality of the human environment", by altering the "environmental status quo" or causing "a significant degradation of some human environmental factor" is that NEPA applies only to those federal actions whose effects may cause *changes in the physical environment.* NEPA's legislative history shows that Congress was only concerned with the effects of federal actions that may cause *changes* in the physical environment. "What is involved [in NEPA] is a congressional declaration that.... *we will not intentionally initiate actions which do irreparable damage to the air, land, and water....*" *Metropolitan Edison Co. v. People Against Nuclear Energy,* 460 U.S. 766, 772–73, 103 S.Ct. 1556, 1560, 75 L.Ed.2d 534 (1983), *citing,* 115 Cong.Rec.

40416 (1969) (Emphasis original). Indeed, a change in the physical environment is the *sine qua non* of any action that alters the "environmental status quo" or causes a "significant degradation of some human environmental factor".

Courts have recognized that federal actions that do not change the status quo of the physical environment do not require the preparation of an EIS under NEPA.[3] For example, in *Ono v. Harper,* 592 F.Supp. 698, 701 (D. Hawaii 1983), local governmental authorities sued to block the transfer of federally owned land to private individuals. The Court stated that "the focus of an [EIS] is the change in the physical environment caused by the federal action at issue" and dismissed the local authorities' NEPA claim because the authorities had not alleged that the transfer of title to the land would cause any change in the physical environment. *Id.* at 701. In *National Association of Property Owners v. United States,* 499 F.Supp. 1223 (D.Minn.1980), *aff'd,* 660 F.2d 1240 (8th Cir.1981), *cert. den.,* 455 U.S. 1007, 102 S.Ct. 1645, 71 L.Ed.2d 876 (1982), the district court rejected a challenge to the implementation of restrictions on recreational activities in a federally-designated wilderness area under the Boundary Waters Canoe Area Wilderness Act, based upon the claim that an EIS was required before the restrictions could be implemented. 499 F.Supp. at 1264–66. The Court held that implementation of the restrictions on activities in the wilderness area did not "significantly affect[ ] the quality of the human environment". *Id.* at 1265.

[T]he Secretary's implementation of the Act enables no person to significantly affect the Wilderness. In fact, plaintiffs' major complaint is simply that Congress' mandate to the Secretary will effectively close portions of the Wilderness.... In essence, plaintiffs' claim is that the Department of Agriculture must prepare an

---

**2.** *See also Sierra Club v. F.E.R.C.,* 754 F.2d 1506, 1510 (9th Cir.1985); *Committee for Auto Responsibility v. Solomon,* 603 F.2d 992, 1002–03 (D.C.Cir.1979), *cert. den.,* 445 U.S. 915, 100 S.Ct. 1274, 63 L.Ed.2d 599 (1980); *Burbank Anti-*

*Noise Group v. Goldschmidt,* 623 F.2d 115, 116–17 (9th Cir.1980, *cert. den.,* 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1981).

**3.** *See* Cases cited at note 2.

EIS in order to leave nature alone. The Court is not moved by this argument. *Id.*

Finally, the principle that NEPA applies only to those federal actions that may cause changes in the physical environment is supported by the corollary principle that NEPA does not require an agency to consider those potential effects of a proposed action that do not have a "reasonably close causal relationship [to] a change in the physical environment caused by the major federal action at issue". *Metropolitan Edison*, 460 U.S. at 774, 103 S.Ct. at 1561. "[T]he congressional concerns that led to the enactment of NEPA suggest[ ] that the terms 'environmental effect' and 'environmental impact' in [NEPA] be read to include a requirement of a reasonably close causal relationship between a *change* in the *physical* environment and the effect at issue." *Id.* at 774, 103 S.Ct. at 1561. Accordingly, any alleged effects of an agency's action that do not have a reasonably close causal relationship to a change in the physical environment caused by the agency's action are not within the scope of NEPA and can not form the basis of a NEPA claim.

In summary, whether the FWS should have prepared an EIS concerning its acquisition of the conservation easement depends upon whether the FWS's action is one that may "significantly affect[ ] the quality of the human environment", which, in turn, depends upon (1) whether the FWS's action may cause "a significant degradation of some human environmental factor" through a change in the physical environment, and (2) whether the allegedly significant effects of the FWS's action have a reasonably close causal relationship to any change in the physical environment caused by the FWS's action.

*No Change in the Status Quo*

■ The FWS's action in this case does not alter the environmental status quo; it does not cause any change in the physical environment.[4] Indeed the purpose of the acquisition of the easement is to foreclose *any* change in the physical environment of a particular wetland site. As the Court observed in *National Association of Property Owners*, NEPA does not require a federal agency to prepare an EIS in order "to leave nature alone". 499 F.Supp. at 1265. NEPA may require an EIS whenever a reservoir is built, but NEPA does not require preparation of an EIS whenever a reservoir is *not* built.

Under *State of Louisiana v. Lee*, the plaintiffs' burden in this case is to allege facts which, if true, would show that the FWS's action may cause "a significant degradation of some human environmental factor" through a change in the physical environment. The plaintiffs have failed to sustain this burden. The Court finds that when the FWS acquires an interest in land, such as a conservation easement, for the express purpose of preserving the land in its then-existing natural state, there is no reasonable possibility that such action may cause "a significant degradation of some human environmental factor" through a change in the physical environment.

*Absence of a Causal Connection*

■ As indicated by the Court in *Metropolitan Edison*, NEPA requires that federal agencies consider only the effects of actions that have a reasonably close causal relationship to changes in the physical environment caused by those actions. The alleged "effects" of the FWS's action in this case are the "elimination" of a potential water supply—the Waters Bluff Reservoir—and the risk that the area served by the SRA will suffer water shortages in the future if the reservoir is not built. The plaintiffs allege that

> [a]cquisition of the Club easement and placement of that easement in the refuge system immediately injured the interests

4. The FONSI issued by the FWS is also consistent with FWS regulations that categorically exclude from the NEPA review process
> [t]he acquisition of land in accordance with the Service's procedures, when the acquisition is from a willing seller, the acquisition planning process has been performed in coordination with the affected public and continuance of essentially the existing use is planned.

Department of the Interior Department Manual, 30 AM 2, Ex. 4, 516 DM 6 App. 1, 1.4A(4) (4/30/84).

of the SRA and others of TWCA's members by eliminating the Waters Bluff Reservoir and setting in motion the effects that followed the elimination of that water supply.

The harmful effect that the plaintiffs claim the FWS's action will have on the environment is the result of what the FWS's action *prevents* SRA and others from doing. Thus, the plaintiffs' claim presents the converse of the typical NEPA claim, which usually involves federal actions that initiate or permit development of natural resources. This case poses the novel question of whether NEPA requires consideration of the effects of federal actions when the effects of those actions are to *foreclose* development or use of some natural resource. The answer to this question is that NEPA does not require a federal agency to consider such effects since those effects result from what the federal action prohibits third parties from doing, and not from any "changes in the physical environment caused by the federal action" itself. The cases cited by SRA and TWCA to support their position are inapposite.

TWCA cites the case of *Environmental Defense Fund, Inc. v. Andrus,* 596 F.2d 848 (9th Cir.1979) for the proposition that a change in the use of water resources caused by federal action requires the preparation of an EIS. In *Andrus,* the Department of the Interior decided to implement a program of marketing substantial amounts of water for industrial uses from two *existing* reservoirs. The diversion of water resources affected both the prospects of future industrial development and the amount of water available for irrigation downstream from the reservoir. The Court of Appeals held that the program was a "major federal action" under NEPA that required the preparation of an EIS. *Id.* at 851–52. *Andrus* can be readily distinguished from this case on the following basis.

In *Andrus,* the diversion of existing water supplies from two existing reservoirs had the effect of altering the amount of water available to agricultural users in order to allocate additional water resources for industrial users. The federal action in *Andrus* clearly had an effect that *changed the physical environment.* In this case, there is no *existing* reservoir, there is no diversion of any existing water resources, and there is no *change in the physical environment* as a result of the acquisition of the easement by the FWS.

The other cases cited by the plaintiffs for the proposition that federal actions that may create "water-supply problems" always require the preparation of an EIS all concern the potential effects that *commercial or industrial development* may have upon water supplies. *See e.g. City of Davis v. Coleman,* 521 F.2d 661 (9th Cir. 1975). Yet commercial or industrial development can not take place absent some *change in the physical environment.* In *Coleman,* the federal action at issue was the proposed construction of a freeway interchange. The Court held in that case that the City of Davis had standing to prosecute a claim under NEPA since the city alleged that "the planned industrial development which the interchange will make possible may adversely affect the quality and quantity of the city water supply because of increased use and the danger of contamination by industrial wastes". *Id.* at 671. Commercial or industrial development and preservation are not synonymous under NEPA, and the FWS's acquisition of a conservation easement does not pose a "water-supply problem" that requires the preparation of an EIS.[5]

The alleged effects of the FWS's action in this case are analogous to the effects analyzed in *Metropolitan Edison* and are likewise beyond the scope of NEPA. In *Metropolitan Edison,* the Nuclear Regulatory Commission prepared an EIS concerning the relicensing of a nuclear-powered electrical generating station. Although the Commission considered the risk of a nuclear accident in its EIS, it decided not to

---

**5.** Another case cited by the plaintiffs, *Goodman Group, Inc. v. Dishroom,* 679 F.2d 182 (9th Cir. 1982) does not address "watersupply problems", but instead holds that socioeconomic impacts of a federal action do not trigger NEPA's requirement of an EIS. *Id.* at 185–86.

consider the effect of this risk upon the psychological health of those who lived near the power plant. The Supreme Court observed that

> a *risk* of an accident is not an effect on the physical environment [and] is, by definition, unrealized in the physical world.... We believe that the element of risk lengthens the causal chain beyond the reach of NEPA.

*Metropolitan Edison,* 460 U.S. at 775, 103 S.Ct. at 1562. The same element of risk is present in the alleged effects of the FWS's action in this case.

One effect of the FWS's action is that as long as the easement remains in the National Wildlife Refuge System, SRA can not build the Waters Bluff reservoir. Although federal law provides certain procedures by which land may be released from the Refuge System, there is certainly a risk that SRA may not convince either the Congress or the Secretary of the Interior to relinquish the easement.[6] According to SRA, failing to build the Waters Bluff reservoir also creates a risk that SRA will face water shortages *in the future* that will adversely affect the economic welfare of the region that SRA serves. Yet a risk that the reservoir will never be built and that water shortages may occur in the future as a result is not an effect on the "physical environment". *Metropolitan Edison,* 460 U.S. at 775, 103 S.Ct. at 1562. There is no causal relationship between such speculative effects and any change in the physical environment caused by the acquisition of the easement. The element of risk inherent in the alleged effects of the FWS's action in this case "lengthens the causal chain beyond the reach of NEPA". *Id.* The Court finds that the effects of the FWS's action upon the plaintiffs are not within the scope of NEPA and can not form the basis of a NEPA claim.

*Plaintiffs' Claims are Contrary to NEPA's Purpose*

█ The FWS's EA reveals that the FWS adequately considered the fact that SRA wanted to acquire the Club's land for an alternative use, but the FWS nevertheless chose to acquire the easement. (AR. D p. 20–21). A careful analysis of the plaintiffs' claims makes it abundantly clear that the plaintiffs simply object to the FWS's policy of acquiring conservation easements on wetland habitat where doing so poses a hindrance to the construction of reservoir projects. The plaintiffs' disagreement with the FWS is more akin to a political dispute over policy choices than a legal dispute over compliance with the procedural requirements of NEPA. *Cf. Foundation on Economic Trends v. Lyng,* 817 F.2d 882, 886 (D.C.Cir.1987). "Neither the language nor the history of NEPA suggests that it was intended to give citizens a general opportunity to air their policy objections to proposed federal actions ... [t]he political process, and not NEPA, provides the appropriate forum in which to air policy disagreements." *Metropolitan Edison,* 460 U.S. at 777, 103 S.Ct. at 1563.[7] To permit the plaintiffs to use the provisions of NEPA to voice their policy objections to the FWS's actions and to hinder the FWS's attempts to fulfill its mandate from Congress would be contrary to the purposes of NEPA.

An analogous situation was presented in the case of *Sierra Club v. Marsh,* 692 F.Supp. 1210 (S.D.Cal.1988). In that case, a city applied for an injunction to prohibit the transfer of certain property from a private party to the United States pursuant to an agreement to settle a lawsuit. The city desired to develop the property in accordance with a local development plan. If

---

**6.** No land that is a part of the Refuge System may be disposed of except by Act of Congress unless (1) the Department of the Interior and the Migratory Bird Conservation Commission determine that such lands are no longer needed for wildlife refuge purposes and the Department is paid the fair market value of the land, (2) the Department acquires other lands by exchange, or (3) such land is transferred pursuant to the terms of a cooperative agreement with a state or local government, by which agreement the land originally became part of the refuge system. 16 U.S.C. § 668dd(a)(3).

**7.** Legislation that would withdraw the Club Easement from the Refuge System is now pending before the Marine and Fisheries Committee in the House of Representatives.

transferred, the land would be used as a wildlife refuge, in mitigation for other land involved in the construction of a local highway/flood control project. The city passed an ordinance that imposed certain conditions upon the transfer which would have rendered the land useless as a wildlife refuge. *Id.* at 1215. The Court's discussion of the city's claim has particular relevance to this case.

> The federal government is trying to discharge its obligations under a high priority federal program to protect endangered species. A private landowner wants to donate the land to the government to effectuate these purposes. The City of Chula Vista has passed a local resolution in an attempt to stymie any transfer of the property which it believes does not serve the City's interests, which it has defined as development in strict accordance with its [local development plan].

*Id.* at 1215.

The Court found that the City's NEPA claim presented "the anomalous situation in which a municipality is trying to use federal environmental laws as a means of protecting a plan for desired local commercial and residential development". *Id.* at 1221. The Court rejected the city's NEPA claim on the grounds that "[i]t would be inconsistent with NEPA's purposes to allow the city to use NEPA to obstruct [the land transfer] which will protect endangered species." *Id.*

In this case, the FWS is attempting to carry out an express mandate from Congress to acquire and protect wetland habitat.

> It is the purpose of this Act to promote, in concert with other Federal and State statutes and programs, the conservation of the wetlands of the Nation ... by (2) intensifying efforts to protect the wetlands of the Nation through acquisition [of wetlands] in fee, easements or other interests ...

Emergency Wetlands Resources Act of 1986, 16 U.S.C. § 3901(b)(2).

This case also presents the anomalous circumstance of a governmental entity attempting to use the provisions of NEPA to protect its plan to *develop* natural resources in a manner that will unquestionably result in substantial changes in the physical environment. To permit the plaintiffs to use the federal environmental laws to this end and to hinder the FWS's efforts to carry out its directive from Congress would be contrary to the purposes of NEPA and contrary to the FWS's mandate under § 2(b)(2) of the Emergency Wetlands Resources Act.

*Plaintiffs lack Standing under NEPA*

■ To have standing to challenge the FWS's action under NEPA, the plaintiffs must show that they have been adversely affected by the FWS's action within the meaning of NEPA. *See Lujan v. National Wildlife Federation,* — U.S. —, 110 S.Ct. 3177, 3185–86, 111 L.Ed.2d 695 (1990). In other words, the plaintiffs must establish that the injury of which they complain "falls within the zone of interests sought to be protected by the statutory provision whose violation forms the legal basis of [the] complaint". *Id.* 110 S.Ct. at 3186. The Court's finding that the plaintiffs' claims are not within NEPA's scope and that they are contrary to NEPA's purpose compels the conclusion that the plaintiffs lack standing to assert a claim under NEPA. The plaintiffs' interest in constructing a reservoir is unquestionably an interest that is *subject* to the provisions of NEPA, but it is not an interest that NEPA was designed to protect.

*Summary*

The Court finds that the FWS's decision not to prepare an EIS concerning the easement acquisition was not arbitrary and capricious; the FWS adequately considered all relevant factors, and there is no clear error in its judgment. *Marsh v. Oregon Natural Resources Council,* 490 U.S. at —, 109 S.Ct. at 1861. The FONSI issued by the FWS is correct since there is "no reasonable possibility" that the FWS's action will cause "a significant degradation of some human environmental factor" through a change in the physical environment. *State of Louisiana v. Lee,* 758 F.2d

at 1085. Furthermore, the plaintiffs' claims are not within the scope of NEPA because (1) the alleged effects of the FWS's action lack the requisite causal relationship to any change in the physical environment caused by the acquisition of the easement, *Metropolitan Edison,* 460 U.S. at 773, 103 S.Ct. at 1561; and (2) the plaintiffs' claims are an improper attempt to use the provisions of NEPA to hinder the FWS in carrying out its mandate from Congress to acquire and preserve wetland habitat. For these same reasons, the plaintiffs also lack standing to assert a claim under NEPA, since the plaintiffs' alleged injury is not within the "zone of interests" that NEPA was designed to protect.

## IV. ADEQUACY OF THE EA

■ As an alternative to their contention that the FONSI is incorrect, the plaintiffs contend that the EA prepared by the FWS is inadequate in several respects and that the case should be remanded to the FWS for further consideration. The Court has carefully reviewed the EA in light of the administrative record and the applicable law and finds that the EA is adequate.

Preparation of an EA is the proper procedure for an agency to utilize in determining whether to prepare an EIS concerning a proposed action. *Vieux Carre Property Owners, Residents and Associates, Inc. v. Pierce,* 719 F.2d 1272, 1281 (5th Cir.1983); 40 C.F.R. § 1508.9(a)(1). Federal agencies have a duty to prepare a reviewable administrative record, and a court must review the reasonableness of the agency's determination on the basis of the information available to the agency at the time the EA was prepared. *Citizen Advocates for Responsible Expansion, Inc. v. Dole,* 770 F.2d at 433. NEPA does not mandate any particular result of the review process but only requires that federal agencies take a "hard look" at the environmental consequences of a proposed action before such action is undertaken. *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, ——, 109 S.Ct. 1835, 1846, 104 L.Ed.2d 351 (1989). As long as an agency adequately considers the consequences of its proposed action, NEPA does not prohibit the agency from

concluding that the benefits of its action outweigh its costs. *Id.* "NEPA merely prohibits uninformed—rather than unwise—agency action." *Id.*

### Consideration of the Need for Action

■ In this case, the FWS selected the land owned by the Club for possible acquisition on the basis of the findings of a biological survey conducted at the FWS's request. (AR. A). The survey identified the Club's land as a particularly valuable site of wetlands habitat, habitat that numerous studies had indicated was rapidly diminishing. (AR. A–IV). The FWS used the findings of the biological survey in compiling the Concept Plan and Land Protection Plan. (AR. C, p. 3). The FWS's reliance on the survey data to evaluate the importance of acquiring the conservation easement on the Club land was clearly reasonable.

### Consideration of Water–Supply Issues

■ Both the survey and the Concept Plan identified planned reservoir projects as a principal source of conflict with preservation of wetland sites in eastern Texas. (AR. B, p. 133). The survey specifically excluded wetlands sites that might conflict with planned reservoir projects. (AR. A–II). In evaluating the extent of the conflict between wetlands sites and planned reservoir projects, the FWS relied upon the 1984 Texas Water Plan developed by the Texas Department of Water Resources. (AR. H). The FWS's reliance on the Water Plan's data and projections concerning future reservoir projects and water supplies was reasonable in light of the fact that the Water Plan is "designed to be a state-wide comprehensive estimation of the future water demands and supplies for all of Texas over a 50–year planning period". (Amicus Brief of the State of Texas at p. 8).

Although Waters Bluff was not listed as a planned reservoir in the Water Plan, the FWS nevertheless reviewed the SRA's Master Plan Update which contained SRA's own water supply projections to support its conclusion that Waters Bluff is a feasible and necessary reservoir project. (AR. D, p.

13, 50; AR. L—N). SRA's Master Plan Update relied on the Water Plan to provide "some of the basic data sources utilized in the projections of future basin water requirements". (AR. M, p. 1–6). The record indicates that the FWS fully considered the available data on future water supply needs of the Sabine River Basin contained in both the Water Plan and SRA's Master Plan Update. The final EA issued by the FWS contains an adequate discussion of the water-supply issues raised by SRA in its opposition to the proposed easement. (AR. D, p. 12–16).

There is no indication that the FWS failed to consider pertinent data in reaching its conclusion. The plaintiffs merely disagree with the FWS's interpretation of the available data and the conclusion that the FWS reached. Yet "the mere existence of differing opinions does not make [the agency's] decision erroneous." *State of Louisiana v. Lee,* 758 F.2d at 1085. This Court can not conclude that the FWS's review of the water-supply issues raised by SRA was inadequate or that the FWS's conclusion was unreasonable, arbitrary or capricious.

*Consideration of Alternatives*

■ The plaintiffs contend that the FWS failed to adequately consider alternatives to acquisition of the easement. The FWS considered four alternatives: (1) taking no action to preserve the Club's land, (2) establishing a refuge in conjunction with the Waters Bluff project, (3) acquiring the Club's land in fee simple, and (4) acquiring a less-than-fee-simple interest in the Club's land. (AR. D, p. 20–25). SRA faults the FWS for not considering the acquisition of high priority wetland habitat outside the area of SRA's Waters Bluff project and for failing to adequately consider establishing a refuge in conjunction with the Waters Bluff project.

Once an agency adequately addresses alternatives to its proposed action, "the decision of which alternative to follow is within the agency's discretion". *South Louisiana Environmental Council, Inc. v. Sand,* 629 F.2d 1005, 1017 (5th Cir.1980). "[T]he range of alternatives that reasonably must be considered decreases as the environmental impact of the proposed action becomes less and less substantial". *Olmsted Citizens for a Better Community v. United States,* 793 F.2d 201, 208 (8th Cir.1986). Although consideration of some range of alternatives is essential to any environmental assessment, it makes little sense to fault an agency for failing to consider "more environmentally sound alternatives to a project which it has [*properly*] determined, through its decision not to file an impact statement, will have no significant environmental effects anyway". *Id.; see also City of New York v. United States Dept. of Transportation,* 715 F.2d 732, 744 (2nd Cir.1983), *cert. den.,* 465 U.S. 1055, 104 S.Ct. 1403, 79 L.Ed.2d 730 (1984). Since the FONSI concerning acquisition of the easement is correct, the range of alternatives considered by the FWS was adequate.

The FWS considered and rejected the no-action alternative for the simple reason that doing nothing to preserve the highest priority site of wetland habitat would not be consistent with the FWS's preservation efforts and would likely permit the irretrievable loss of the habitat. (AR. D, p. 21). Similarly, establishing a refuge in conjunction with the Waters Bluff project was rejected because that alternative would not prevent destruction of the wetland habitat. (AR. D, p. 20–21). The FWS also concluded that any area set aside for refuge purposes would be of inferior quality. (AR. D, p. 20–21). This conclusion is supported by the report issued by the Texas Parks and Wildlife Department which suggested that wetland sites established in conjunction with reservoir projects are of only "marginal" value to waterfowl populations. (AR. K–I–7, p. 18–19). Acquisition of the Club's land in fee-simple was not an available alternative because the Club was not willing to sell, and the FWS was operating under budgetary constraints that made no-cost acquisitions especially attractive. (AR. D, p. 23–24). The Court finds that the FWS's consideration of these alternative courses of action was adequate and reasonable.

*Consultation with Other Agencies*

■ The plaintiffs contend that the FWS failed to properly consult with other federal and state agencies during the NEPA review process. This claim is not supported by the evidence in the record, and it is based on the erroneous assumption that NEPA mandates inter-agency consultation *before* a draft EA is prepared.

Although the applicable regulations do not address the timing of inter-agency consultation in the preparation of an EA, the regulations do provide that after preparing a draft EIS and before preparing a final EIS the agency shall obtain the comments of other Federal agencies and request the comments of appropriate State and local agencies. 40 C.F.R. § 1503.1(a)(1, 2). The regulations further provide that an agency shall respond to such comments. *Id.* at § 1503.4(a). There is nothing in NEPA or the applicable regulations to suggest that the timing of consultations should be any different when an agency prepares a draft EA as opposed to a draft EIS.

The record indicates that the FWS circulated its draft EA to all appropriate federal and state agencies. (AR. D, p. 49–50; AR. G–84). The FWS then received a number of written comments both critical and supportive of its proposed action. (AR. K). The FWS also received oral and written comments during the public meeting concerning the easement. (AR. I). In response to these comments, the FWS revised its draft EA to include a discussion of the alleged controversial aspects of its acquisition of the easement. (AR. P, p. iii; AR. D, p. iii). While the draft EA contained only a brief reference to SRA's Waters Bluff project, the final EA contains a responsive discussion of the water-supply issues raised by SRA. (AR. P, p. 9; AR. D, p. 12–16). The FWS also revised the EA to address the alternative of establishing a refuge in conjunction with the Waters Bluff project. (AR. P, p. 11–12; AR. D, p.

20). Thus, the record demonstrates that the FWS considered and responded to the comments raised in opposition to the easement.[8] The FWS's action was consistent with the requirement that an agency involve the public as well as other government agencies in preparing an EA. *See* 40 C.F.R. § 1501.4(b). That the FWS chose not to agree with the objections raised by SRA and others does not undermine the adequacy of the FWS's NEPA review.

*30–Day Comment Period*

■ A related issue raised by the plaintiffs is the FWS's alleged failure to provide a 30–day comment period after the FONSI was issued. *See* 40 C.F.R. § 1501.4(e)(2). This regulation mandates such an additional comment period if the agency's proposed action (1) is, or is closely similar to, action that "normally requires" the preparation of an EIS under regulations adopted by the agency, or (2) "the nature of the action is one without precedent". § 1501.4(e)(2)(i-ii).

Whether the acquisition of the conservation easement is or is similar to an action that "normally requires" the preparation of an EIS under Department of Interior regulations is the subject of somewhat conflicting provisions in those regulations. On the one hand, the regulations provide that an FWS proposal to establish "new refuges, fish hatcheries, or research stations and major additions to existing installations" will "normally require the preparation of an EIS". Department of the Interior Department Manual, 516 DM 6, App. 1, 1.3A(1). The regulations further provide that if an EIS is not prepared for such proposals, "an EA will be prepared and handled in accordance with § 1501.4(e)(2)". *Id.* at 1.3B. On the other hand, the regulations categorically exclude from the NEPA process "acquisition of land in accordance with the Service's procedures, when acquisition is from a willing seller, the acquisition planning process has been performed

---

**8.** The case cited by the plaintiffs in support of their contention is readily distinguishable. In *Simmans v. Grant*, 370 F.Supp. 5, 18–19 (S.D. Tex.1974), the Court found that the federal agency had failed to contact, or to consider the views of, several other agencies in preparing an EA and a FONSI and that there had been little or no opportunity provided for the public to express its views on the agency's proposed action. The record in this case reveals no similar deficiency in the FWS's NEPA review process.

in coordination with the affected public and continuance of essentially the existing use is planned". *Id.* at 516 DM 6, App. 1, 1.4A(4). The resolution of this apparent conflict lies in a common-sense interpretation of these provisions.

Although the effect of the FWS's actions in this case was to create a "new refuge", the other types of actions described in section 1.3A(1) are sufficiently dissimilar to the FWS's action in this case to support the conclusion that the acquisition of a conservation easement by the FWS is not the "establishment of [a] new refuge[ ]" for purposes of section 1.3A(1). "Establishment of new ... fish hatcheries, research stations and major additions to existing installations" involves more than the mere acquisition of a property interest such as a conservation easement. This interpretation of section 1.3A(1) is thus fully consistent with section 1.4A(4)'s categorical exclusion of land acquisitions by the FWS from a willing seller where a continuation of the existing use of the land is planned—an apt description of the FWS's action in this case. That the FWS prepared an EA concerning the easement acquisition does not undermine this conclusion because the regulations provide that an EA "may be prepared on any action [even those covered by a categorical exclusion] at any time in order to assist planning and decision-making". *Id.* at 516 DM 3.2; *see also* 40 C.F.R. § 1508.4. Accordingly, the FWS's action in this case was not one that would normally require the preparation of an EIS under regulations adopted by the FWS, nor was it similar to such an action.

The 30–day comment period must also be provided if "the nature of the proposed action is one without precedent". 40 C.F.R. 1501.4(e)(2)(ii). Whether the "nature" of the FWS's action is "without precedent" is largely a function of the definition one assigns to the term "nature". If, as the plaintiffs argue, the "nature" of the FWS's action is the acquisition of a conservation easement in an area where construction of a reservoir is planned, then the action is "without precedent" since the FWS admits that no other conservation easements have been acquired in an area

where a reservoir project is planned. Yet the common understanding of the term "nature"—the essential character of something—illustrates that the FWS's action was not "without precedent". The essential character of the FWS's action is the acquisition of a conservation easement under circumstances that pose a conflict with another party's desired uses of the same land. The "nature" of the FWS's action is not "without precedent" since the FWS has heretofore acquired similar easements under circumstances that also posed a conflict with other potential uses of the same land. (AR. D, p. iii). Because the FWS's action was not without precedent, no additional comment period under 40 C.F.R. § 1501.4(e)(2) was required.

Finally, even if the Court were to find that the 30–day comment period applied to the FONSI in this case, the plaintiffs have failed to identify any *additional* relevant information that they or any other party would have provided the FWS. Accordingly, there is nothing to suggest that the absence of the additional comment period deprived the FWS of relevant information such as would undermine the reasonableness or adequacy of the FWS's NEPA review process.

*Consideration of Controversy, Precedent and Cumulative Effects*

 The plaintiffs also contend that the FWS failed to consider the extent of the controversy surrounding its action, the precedential nature of the action, and the cumulative effects of acquiring additional conservation easements. This claim is based on regulations that provide that in determining whether a proposed action is "significant" under NEPA, the "intensity" or severity of the environmental "impact" of the proposed action must be considered. 40 C.F.R. § 1508.27(b). Among the several factors listed for consideration in determining "intensity" are the "degree to which the effects on the quality of the human environment are likely to be highly controversial", "the degree to which the action may establish a precedent for future actions with significant effects", and whether the action is related to other actions with

individually insignificant but cumulatively significant impacts". *Id.* at § 1508.27(b)(4, 6, 7).

The only "effects" or "impacts" that must be considered under NEPA, however, are those that have a reasonably close causal relationship to a *change* in the *physical* environment caused by the federal action at issue. *Metropolitan Edison*, 460 U.S. at 773, 103 S.Ct. at 1561. The Court has already found that the alleged effects of the FWS's action in this case—interference with SRA's plans to build Waters Bluff and a risk of future water shortages—lack the requisite causal relationship because acquisition of the easement *will not* cause any change in the physical environment. Since the alleged effects of the FWS's acquisition of the easement are beyond the scope of NEPA, the factors listed in § 1508.27(b) are of no legal significance to this case, because such factors are only relevant to an evaluation of whether the "effects" of a proposed action are "significant" under NEPA.

The case cited by the plaintiffs, *Sierra Club v. Marsh*, 769 F.2d 868 (1st Cir.1985) does not compel a contrary finding. That case discussed "precedent for future actions with significant effects" in the context of actions taken by an agency that would *encourage* further commercial or industrial development. *See Id.* at 879. Such is not the case here. To the extent that the acquisition of this easement sets a precedent for acquisitions of additional conservation easements by the FWS, such future actions would not have "significant effects" under NEPA because the acquisition of such easements does not cause any "change in the physical environment".

*Summary*

Although the plaintiffs disagree with the FWS's evaluation of the data compiled in the NEPA review process as well as the conclusions reached by the FWS, such disagreement is not sufficient to raise a NEPA claim. The purpose of NEPA is to ensure that federal agencies do not make uninformed, as opposed to "unwise", decisions that affect the environment, and so long as an agency adequately considers the consequences of its proposed action, NEPA does not prohibit the agency from concluding that the benefits of its action outweigh its costs. *Robertson v. Methow Valley Citizens Council*, 490 U.S. at ——, 109 S.Ct. at 1846. The record shows that in this case, the FWS adequately considered the environmental consequences of its action and that is all that NEPA requires.

## V. CONCEPT PLAN NOT SUBJECT TO NEPA

█ The plaintiffs also contend that the FWS should have prepared an EIS concerning the Preservation Program. Unless the Preservation Program is a "proposal" for a major federal action, NEPA does not require the preparation of an EIS. *See Kleppe v. Sierra Club*, 427 U.S. 390, 399, 96 S.Ct. 2718, 2725 (1976); *Foundation On Economic Trends v. Lyng*, 817 F.2d 882, 885–86 (D.C.Cir.1987). "The mere contemplation of certain action is not sufficient to require an impact statement." *Fritiofson v. Alexander*, 772 F.2d at 1240. Under 40 C.F.R. § 1508.23, a

> [p]roposal exists at the stage in the development of an action when an agency ... has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal and the effects [of the proposed action] can be meaningfully evaluated.

After carefully reviewing the Preservation Program as set forth in the FWS's Concept Plan document (AR. B), the Court finds that the Preservation Program is not a "proposal" for major federal action under NEPA.

The plaintiffs characterize the Concept Plan document as a proposal for a series of land acquisitions by the FWS. The alleged effect of this proposal is, once again, the "elimination" of potential reservoir sites. As the Court discussed earlier at length, such effects are not within the scope of NEPA because of the absence of any causal connection between acquisition of conservation easements and any changes in the physical environment. For this reason alone, the plaintiffs can not maintain a NEPA claim concerning the Preservation

Program. Additionally, a plain reading of the Concept Plan demonstrates that it is nothing more than a preliminary study document that the FWS intends to use as a basis for making specific proposals for land acquisitions in the future.

The FWS's guidelines concerning land acquisitions explain that a concept plan such as the one prepared for the Preservation Program is only a preliminary step in the FWS's decision making process concerning land acquisitions. (FWS Realty Manual, 2 REM 2.10–11).[9] Even after a concept plan is prepared, land acquisitions may be rejected after the FWS conducts further study and planning. *Id.* It is only after such further study and planning that the FWS prepares a "decision document" concerning a specific proposal for land acquisition, and the guidelines provide that such decision documents shall be prepared in accordance with NEPA. Thus, the Preservation Program Concept Plan is not a "proposal" under NEPA, and the statements contained in the Preservation Program Concept Plan support this conclusion.

The majority of the Preservation Program Concept Plan document is simply informational in nature. The Concept Plan contains an extensive discussion of the types of flora and fauna found in bottomlands habitat. (AR. B, pp. 29–82). There is also an extensive review of the natural resources and socio-economic features of the East Texas area encompassing bottomlands habitat. (AR. B, pp. 83–123). The statements contained in the document that relate directly to acquisition of bottomlands habitat show that the Concept Plan does not contain a "proposal" for land acquisitions.

> In the Concept Plan, the FWS states that [t]he purpose of this program is to *identify and seek methods for preserving* as much of the remaining bottomlands habitats of east Texas as possible ... A total of 62 areas of widely varying quality have been identified ... *Not all of these sites are being recommended for preservation, and other areas may be listed*

> *as additional information becomes available.*

(AR. B, p. 4).

The Concept Plan also recites that "[a] stated acreage and policy objective for [preserving] bottomlands in Texas is very difficult, *because of the infancy of the program and the complexity of the biological and sociological factors involved.*" (AR. B, pp. 3–4). Although the Concept Plan divides areas of bottomlands habitat into six priority groups, the Concept Plan specifies that the categories may be subsequently reviewed and revised by the FWS and other parties. (AR. B, p. 22). Finally, the FWS states in the Concept Plan that it has only a "minimal amount" of information concerning the owners of lands that encompass bottomlands habitat, and that only after the FWS contacts landowners will a "detailed preservation plan" be prepared for a specific site. (AR. B, p. 22).

These statements belie the plaintiffs' assertion that the Concept Plan is a "proposal" for federal action. The Concept Plan does not identify which sites will be acquired by the FWS, nor does it identify which of the various suggested alternative methods of preservation might be used to acquire any particular site or category of sites. Thus, there are no discernible "effects" of any particular acquisition or series of acquisitions that can be meaningfully evaluated under NEPA. Accordingly, the Court finds that the FWS was not required to prepare an EIS concerning the Preservation Program, since the Program is not a "proposal" for major federal action.

## VI. NO VIOLATION OF 16 U.S.C. § 460k OR § 742a

■ In its Original Complaint, SRA alleged that the terms of the easement restricting public access to the Club's property violated provisions of the Fish and Wildlife Act, 16 U.S.C. § 742a, and the Refuge Recreation Act, 16 U.S.C. § 460k. Not only do these statutes fail to provide any basis for SRA's claims, these statutes specifically authorize the FWS's action in this case.

**9.** Appendix 6, Federal Defendants' Motion for Summary Judgment.

The Fish and Wildlife Act provides in part that

The Secretary of the Interior is authorized to accept any gifts, devises, or bequests of real or personal property ... for the benefit of the United States Fish and Wildlife Service ... Such acceptance may be subject to the terms of any restrictive or affirmative covenant, or condition of servitude, *if such terms are deemed by the Secretary to be in accordance with law and compatible with the purpose for which acceptance is sought.*

16 U.S.C. § 742f(b)(1).

The Refuge Recreation Act grants the Secretary similar discretion to permit or restrict public use of refuge areas, and to accept donations of real property under such restrictions as the *Secretary may deem to be compatible with the purposes of the refuge areas.* 16 U.S.C. § 460k. SRA has failed to demonstrate that the FWS's acceptance of the easement under terms restricting the public's access to what remains privately owned land was unreasonable, arbitrary or capricious.

## VII. SUMMARY

For the foregoing reasons, the Court finds that (1) the FWS's FONSI concerning the acquisition of the conservation easement is correct because there is "no reasonable possibility" that the FWS's action will cause "a significant degradation of some human environmental factor" through a change in the physical environment; (2) the alleged effect of the FWS's action—"elimination of a potential reservoir site"—is not within the scope of NEPA because there is no causal relationship between the alleged effect and any change in the physical environment caused by the acquisition of the easement; (3) the plaintiffs lack standing under NEPA to challenge the FWS's acquisition of the easement; (4) the EA prepared by the FWS was adequate; (5) NEPA does not require the FWS to prepare an EIS concerning its Preservation Program, as set forth in the Concept Plan, because the Program is not a "proposal" for a major federal action; and

(6) the FWS did not violate the Fish and Wildlife Act or the Refuge Recreation Act by agreeing to accept the easement under terms that restrict the public's access to the Club's property. Therefore, it is

ORDERED the Motions for Summary Judgment filed by the plaintiff Sabine River Authority and plaintiff-intervenor Texas Water Conservation Association are DENIED. It is further

ORDERED the Motions for Summary Judgment filed by the defendants United States Department of Interior and United States Fish and Wildlife Service, Little Sandy Hunting and Fishing Club, and defendant-intervenors Sierra Club and National Audubon Society are GRANTED, and all of the plaintiffs' claims against all of the defendants are DISMISSED WITH PREJUDICE.